DREW, J.
 

 | tin this tragic auto accident case that resulted in a fatality, Progressive Security Insurance Company appeals a judgment finding that it provided primary insurance coverage to a temporary substitute vehicle and ordering it to pay damages.
 

 We reduce the wrongful death award for loss of support from $160,000.00 to $122,000.00. In all other respects, the judgment is affirmed.
 

 FACTS
 

 On the morning of May 28, 2005, Brian Smith was driving a 2003 Nissan Altima on U.S. Highway 425 in Morehouse Parish. Smith was driving to Arkansas to deliver the car to his mother, Gracie Smith, as a surprise gift. At the same time, a 1998 Dodge Ram pickup truck (“1998 Dodge”) being driven by Joshua Pruett was proceeding southbound in the opposite direction on the two-lane highway. Pruett, who had left Crowley, Louisiana, nearly six hours earlier to deliver crawfish to businesses in North Louisiana on behalf of his employer, Broubar, Inc., was heading to his last stop.
 

 The 1998 Dodge was pulling a 1994 Wolverine utility trailer. Unfortunately, the ball on the truck was too small for the trailer hitch and there were no safety chains being used to ensure that the trailer and truck remained attached. Pruett estimated the trailer carried 5,000 pounds of crawfish and ice when he left Crowley, so that weight was probably what kept the trailer attached to the truck, but when the
 
 *466
 
 load became lighter as Pruett made his deliveries, the risk of a terrible accident increased. At approximately 8:01 a.m., the trailer disconnected, crossed the center-line, |2and collided with the driver’s side of Brian’s vehicle. Brian died from the injuries he sustained in the accident. Pruett was cited for failing to use safety chains to attach the trailer to the truck.
 

 Broubar, Inc., d/b/a Acadia Crawfish, was a crawfish wholesaler owned and operated by Scott Broussard. Pruett was employed by Broubar. Ordinarily, a 2005 Dodge Ram 3500 Quad Cab pickup truck (“2005 Dodge”) with a cooler attached to its bed would have made the trip to North Louisiana. However, the 2005 Dodge, which was insured by Progressive, was in the shop for repairs, so Broussard substituted the 1998 Dodge, which was insured by Farm Bureau. Unlike the 2005 Dodge, the 1998 Dodge could not hold a cooler for the crawfish in its bed. Therefore, the trailer was used to hold a cooler.
 

 On June 10, 2005, Gracie Smith, individually and on behalf of her son, filed suit against Acadia Crawfish, Pruett, and Farm Bureau as liability insurer and as Brian Smith’s UM insurer. The petition was amended to add Scott Broussard as a defendant.
 

 On November 3, 2005, Gracie Smith, individually and on behalf of her son’s estate, filed a separate lawsuit against Progressive Security Insurance Company and Broubar, Inc. The two lawsuits were later consolidated.
 

 Mrs. Smith settled her claims against Farm Bureau to the policy limits of $100,000.00 under the liability coverage and $10,000.00 under the UM coverage. Farm Bureau filed a cross claim and third party demand against ^Progressive, seeking indemnification for the $110,000.00 that it paid to Mrs. Smith.
 

 The parties stipulated to liability and proceeded to trial. The trial court concluded that the 1998 Dodge and the trailer constituted a temporary substitute vehicle operating as a single unit, and Progressive was bound to provide primary insurance coverage.
 

 The court found that Brian Smith briefly survived the accident, and awarded $250,000.00 in damages on the survival claim. On the wrongful death claim, the court awarded damages of $450,000.00 in compensatory damages, $160,000.00 for loss of support, $5,000.00 for loss of services, and $7,368.30 for funeral expenses. The court ruled in favor of Farm Bureau on its subrogation claim of $110.000.00. Progressive has appealed.
 

 DISCUSSION — INSURANCE COVERAGE
 

 Broubar, Inc., d/b/a Acadia Crawfish, was the named insured on a Commercial Auto Policy issued by Progressive. Joshua Pruett was named as a rated driver on the policy, along with the other drivers who delivered crawfish for Broubar. The relevant policy term began on April 1, 2005. The premium was $26,681.00. The vehicles scheduled on the policy were a 1993 International Refrigerator Truck and two 2005 Dodge Ram 3500 Quad Cab pickup trucks (“2005 Dodges”).
 

 The 2005 Dodges were used to deliver crawfish. Broussard purchased these trucks in his name because that was the only way he could get 0% financing on the purchase. The 2005 Dodges remained titled and registered in Broussard’s name. However, he considered the 2005 Dodges |4as owned by Broubar because they were purchased for Broubar’s purposes and Broubar paid the notes and insurance on them.
 

 Scott Broussard had an auto liability insurance policy with Farm Bureau with a
 
 *467
 
 policy period from April 9, 2005, to April 9, 2006. Although the policy was issued to Broussard personally, it covered vehicles used at Scott Broussard Farm and the premiums were paid from the farm account. The policy premium was $11,663.46. Among the eight vehicles listed on the policy schedule was the 1998 Dodge, which was titled and registered in Broubar’s name after it was acquired in January of 2003. A customer had owed money to Broubar, so the truck was taken for partial payment of the debt.
 

 Broussard thought of the 1998 Dodge as owned by him because he used it at his farm. The 1998 Dodge was originally used to deliver crawfish for Broubar, and it had a cooler in its bed. After June of 2003, it was no longer used to deliver crawfish and Broussard’s son took it with him to college in Texas until December of 2004.
 

 Broussard explained that for tax reasons, he had not changed the titles on the 1998 and 2005 Dodges to accurately reflect their ownership; also, he considered it a hassle to make the changes.
 

 In 2003, Farm Bureau dropped coverage of the trucks that delivered for Broubar. When Broubar applied for insurance with Progressive in April of 2003, the 1998 Dodge, a horse trailer, and a Chevrolet vehicle were included in the original quote. Broussard subsequently asked that these vehicles be deleted from the quote, so that the Progressive policy initially | Jisted a 1993 International truck and two Ford 2001 pickup trucks on its auto coverage schedule.
 

 Broussard related that the original quote from Progressive included the 1998 Dodge because he wanted a quote including every vehicle that had been listed on the Farm Bureau policy. He eventually had the vehicles used at the farm removed from the quote, so that only the vehicles used by Broubar were scheduled vehicles on the Progressive policy.
 

 Temporary Substitute Vehicle
 

 The coverage of temporary substitute vehicles is now governed by La. R.S. 22:1296, which was renumbered from La. R.S. 22:681 in 2008. At the time of the accident, La. R.S. 22:681 provided:
 

 Every approved insurance company, reciprocal or exchange, writing automobile liability, physical damage, or collision insurance, shall extend to temporary substitute motor vehicles as defined in the applicable insurance policy and rental private passenger automobiles any and all such insurance coverage in effect in the original policy or policies. Where an insured has coverage on multiple vehicles, at least one of which has comprehensive and collision insurance coverage, that comprehensive and collision substitute coverage shall apply to the temporary substitute motor vehicle or rental motor vehicle. Such insurance shall be primary. However, if other automobile insurance coverage is purchased by the insured for the temporary substitute or rental motor vehicle, that coverage shall become primary. The coverage purchased by the insured shall not be considered a collateral source.
 

 Prior to rendering its ruling, the trial court submitted 15 questions to the parties for consideration. The trial court later provided “answers” to these questions that in effect supplemented its written reasons for judgment. Among the court’s answers was that the definition of “temporary substitute vehicle” required in a policy by La. R.S. 22:681 needed to be sufficient to | (¡make clear the meaning of “temporary substitute vehicle” in such a way that explanation, interpretation, or clarification was not needed. The trial court concluded that the necessary definition was not found in the Progressive policy.
 

 
 *468
 
 Although “temporary substitute vehicle” was not given its own line item in the general definitions section of its policy, Progressive contends its policy complies with La. R.S. 22:681 in the manner in which it defines “temporary substitute vehicle.” Progressive cites the following provisions in its policy:
 

 9. “Your insured auto” or “insured auto” means:
 

 [[Image here]]
 

 c. Any non-owned auto while you or an employee of yours is temporarily driving it as a substitute for any other auto described in this definition because of its withdrawal from normal use for a period of not greater than 30 days without notification to us due to breakdown, repair, servicing, loss or destruction. Coverage for PART III — DAMAGE TO YOUR AUTO does not apply to these temporary substitute autos.
 

 [[Image here]]
 

 11. “Non-owned auto” means any auto which is:
 

 a. not owned by or registered to you, your nonresident spouse or a resident of the household in which you reside; [or]
 

 b. not hired, owned by or borrowed from your employees or members of their households^]
 

 Progressive contends that the 1998 Dodge was registered and titled in Brou-bar’s name, making Broubar its owner. As such, the 1998 Dodge could not have been a “non-owned auto” as defined by the policy.
 

 Progressive further argues that even if the 1998 Dodge was owned by Scott Broussard, it would still not be a “non-owned auto” under the policy because Broussard was an employee of Broubar. Broussard was the owner |7and operator of Broubar. However, he received a Form W-2 from Broubar in 2004, and wages paid by Broubar to Broussard were reported to the state for each quarter of 2005.
 

 In support of its argument that its policy adequately defines a temporary substitute vehicle as a non-owned auto, Progressive cites
 
 State Farm Mut. Auto. Ins. Co. v. U.S. Agencies, L.L.C.,
 
 2005-0728 (La.App. 1st Cir.3/24/06), 934 So.2d 745,
 
 writ denied,
 
 2006-0933 (La.6/16/06), 929 So.2d 1288, and
 
 Reynolds v. U.S. Agencies Cas. Ins. Co.,
 
 41,598 (La.App.2d Cir.11/1/06), 942 So.2d 694. Both cases concerned whether an insurer could avoid the requirements of La. R.S. 22:681 by not defining “temporary substitute vehicle” in its policy.
 

 In
 
 State Farm, supra,
 
 the insurers disputed how their policies should be ranked. Drivers insured by U.S. Agencies caused auto accidents while driving vehicles borrowed from State Farm insureds. State Farm argued that U.S. Agencies provided primary coverage pursuant to La. R.S. 22:681. U.S. Agencies responded that because it chose not to define “temporary substitute vehicle” in its policies, the statute was not applicable, and the borrowed autos were to be treated under its policies as “non-owned autos,” making its coverage excess. The U.S. Agencies policies had defined the term “temporary substitute vehicle” until the definition was removed in 2002. U.S. Agencies believed this action exempted it from the provisions of the statute. The First Circuit disagreed, holding that the statute was mandatory, and that an insurer could not opt out of the statute by not defining “temporary substitute vehicles” in its policy. Finally, the court |8concluded that U.S. Agencies had complied with the statute by subsuming the definition of “temporary substitute vehicles” within its definition of “non-owned auto,” and this coverage was primary.
 

 
 *469
 
 In
 
 Reynolds, supra,
 
 this court was faced with the same issue. The tortfeasor, whose truck was insured by U.S. Agencies and unsafe to drive, borrowed a truck that was owned by his grandmother and insured by Allstate. U.S. Agencies again contended that the statute was not applicable because “temporary substitute vehicle” was not defined in its policy, and that its policy provided only excess coverage for “non-owned” vehicles such as the grandmother’s truck. This court followed the reasoning of the First Circuit in
 
 State Farm, supra,
 
 and concluded that U.S. Agencies was bound by the statute to provide primary coverage.
 

 We agree with Farm Bureau’s contention that the statement in
 
 State Farm,, supra,
 
 that the definition of “temporary substitute vehicles” was subsumed within its definition of “non-owned auto,” was
 
 dictum.
 
 The court had already noted that the definition of “temporary substitute vehicle” had been removed from the U.S. Agencies policies.
 

 In regard to the interpretation of insurance policies, our supreme court stated in
 
 Valentine v. Bonneville Ins. Co.,
 
 96-1382, p. 3 (La.3/17/97), 691 So.2d 665, 668:
 

 An insurance policy is a contract between the parties and should be construed using general rules of interpretation of contracts set forth in the civil code. If the wording of the policy at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. The parties’ intent, as reflected by the words of the policy, determines the extent of coverage and such intent is to be determined in accordance with the general, ordinary, plain, and popular meaning of words [9used in the policy, unless the words have acquired a technical meaning. An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve absurd conclusions. If ambiguity still remains after applying other general rules of construction, ambiguous provisions are to be construed against the insurer and in favor of the insured.
 

 (Citations omitted.)
 

 Progressive could have given a clear definition of what constitutes a “temporary substitute vehicle,” but instead chose to bootstrap it to the definitions of “non-owned auto” and “insured auto” found in the General Definitions section of the policy-
 

 Interestingly, the definition of “temporary substitute vehicle” that Progressive contends is found within the definitions of “non-owned auto” and “insured auto” is actually more limited than what is defined as an “insured” under the policy’s UM-bodily injury provisions:
 

 As used in this endorsement:
 

 (1) “Insured” means:
 

 (a) You or a relative.
 

 (b) Any other person occupying an insured auto or a temporary substitute for an insured auto out of service due to breakdown, repair, servicing, loss, or destruction.
 

 Broussard thought Broubar’s use of the 1998 Dodge on the date of the accident was as a “temporary substitute vehicle,” and as such it was covered under Progressive’s policy. Marian Laughlin, a producer for the Landry-Harris Insurance Agency, testified that she informed Brous-sard that because Progressive was writing a Symbol 7 (scheduled auto) policy, all vehicles owned by Broubar had to be listed on the policy in order to be covered.
 

 | mA “temporary” vehicle is one that is used for a limited time, as opposed to a
 
 *470
 
 vehicle that is used permanently.
 
 Yagel v. Sanders,
 
 36,101 (La.App.2d Cir.7/17/02), 828 So.2d 448,
 
 writ denied,
 
 2002-2211 (La.11/8/02), 828 So.2d 1121. “Substitute” connotes the replacement of one thing for another.
 
 Id.
 

 Broubar generally used the 2005 Dodge to deliver crawfish. It was out of service on May 28, 2005, because it was at the dealership for repairs. Broubar’s manager received a call at 4:30 the day prior to the accident that the 2005 Dodge would not be ready to make deliveries. Brous-sard told the manager to haul the crawfish in a trailer attached to the 1998 Dodge. The 2005 Dodge resumed hauling crawfish after it was repaired. When the 1998 Dodge was used in place of the 2005 Dodge, it served as a “temporary substitute vehicle” as those words are commonly used and understood, and it was extended any and all such insurance coverage in effect in the Progressive policy.
 

 The trial court considered the 1998 Dodge and the trailer to be a single unit. Progressive contends that the trial court erred in ruling that the policy provided coverage for the trailer. Progressive states the trailer was not connected to an “insured auto.” Progressive also directs the court to a provision in its policy which stated:
 

 Coverage under this PART I and our duty to defend does not apply to:
 

 [[Image here]]
 

 22. Bodily injury or property damage if your insured auto or a non-owned auto is attached to a trailer with load capacity in excess of two thousand (2,000) pounds if it is not listed in the Declarations and it:
 

 a. is owned by you or your employee[J
 

 |nThe trailer was acquired in April of 2001 by Broubar, in whose name it remained registered. It was not listed on any insurance policy. The trailer also had a label stating its weight capacity was 12,000 pounds. Nevertheless, the trial court correctly treated the 1998 Dodge and the trailer as a single unit.
 

 The 2005 Dodge had a cooler that fit in its bed. This cooler could not fit in the bed of the 1998 Dodge. Therefore, in order for the 1998 Dodge to function as a temporary substitute vehicle for the 2005 Dodge, it needed to pull a trailer that could hold a cooler to keep the crawfish refrigerated. Compare
 
 Yagel v. Sanders, supra,
 
 where a pickup truck was being used in the same capacity as a trailer which was out of service. Moreover, the trailer did not lose its insured status when it accidentally became disconnected from the towing vehicle while in tow.
 
 See Gardner v. Allstate Ins. Co.,
 
 575 So.2d 883 (La.App. 2d Cir.1991),
 
 writ denied
 
 578 So.2d 139 (La.1991).
 

 Accordingly, we find no error in the trial court’s conclusion that the 1998 Dodge truck and the trailer together constituted a temporary substitute vehicle operating as a single unit, and that Progressive was bound to provide primary coverage for damages caused by its insured while operating this temporary substitute vehicle.
 

 Progressive as Primary Insurer
 

 Progressive contends in the alternative that the trial
 
 court
 
 erred in ruling that its coverage was primary to Farm Bureau’s coverage. Progressive likens Broubar and Broussard’s other business entities to a l^single business enterprise, making Scott Broussard the insured as contemplated by La. R.S. 22:681, such that Farm Bureau’s insurance becomes primary to Progressive’s.
 

 In determining whether a corporation is an “alter ego” or part of a “single business entity,” the court must look at the
 
 *471
 
 substance of the corporation rather than the form.
 
 Town of Haynesville, Inc. v. Entergy Corp.,
 
 42,019 (La.App.2d Cir.5/2/07), 956 So.2d 192,
 
 writ denied,
 
 2007-1172 (La.9/21/07), 964 So.2d 384.
 

 In
 
 Green v. Champion Ins. Co.,
 
 577 So.2d 249 (La.App. 1st Cir.1991),
 
 writ denied,
 
 580 So.2d 668 (La.1991), the court supplied a non-exclusive list of factors to consider that are similar to those used to pierce a corporate veil. These factors are:
 

 • Corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control.
 

 • Common directors or officers.
 

 • Unified administrative control of corporations whose business functions are similar or supplementary.
 

 • Directors and officers of one corporation acting independently in the interest of that corporation.
 

 • A corporation financing another corporation, and inadequate capitalization (“thin incorporation”).
 

 • A corporation causing the incorporation of another affiliated corporation.
 

 • A corporation paying the salaries and other expenses or losses of another corporation.
 

 • A corporation receiving no business other than that given to it by its affiliated corporations.
 

 • A corporation using the property of another corporation as its own.
 

 | ia* Noncompliance with corporate formalities.
 

 • Common employees; or services rendered by the employees of one corporation on behalf of another corporation.
 

 • Common offices and centralized accounting.
 

 • Undocumented transfers of funds between corporations, and unclear allocation of profits and losses between corporations.
 

 • Excessive fragmentation of a single enterprise into separate corporations.
 

 Broubar, Inc., d/b/a Acadia Crawfish, was a wholesale business that purchased, sold, and delivered crawfish. It also did catering. Broubar was owned by Scott Broussard and his wife. Broubar had a full-time secretary at its office, and Brous-sard’s wife, who was secretary-treasurer, supervised the secretary. Broubar had a phone number that was separate from Broussard’s personal number. Broubar did not share a business address with Broussard Farm.
 

 Scott Broussard Farm was a sole proprietorship owned by its namesake that farmed crawfish and sold them, mostly to Broubar. The farm also traded crawfish with other farms.
 

 SKB Farms, LLC, also farmed crawfish and sold them. Scott Broussard and his brother, Kevin Broussard, were the only members of SKB in 2005. Scott Brous-sard made the decisions concerning SKB; Kevin kept the records. When SKB sold crawfish to a wholesaler, it sold them exclusively to Broubar. It traded crawfish with others. SKB had a telephone number that was separate from Broubar’s number.
 

 Broussard Farm contracted with SKB to provide “alien” labor. During the farming season, the alien labor would harvest the crawfish at 114Broussard Farm in the morning and then process the crawfish at Broubar in the afternoon. The entities also borrowed employees from one another if needed. Records were kept when an employee was borrowed. The borrowed labor was not always directly paid for, as sometimes the entities would just make a bookkeeping adjustment for cash flow purposes instead of making a payment.
 

 
 *472
 
 The entities also borrowed equipment and trucks. Records were kept when equipment was loaned. Nothing was charged if a truck was borrowed. During the crawfish off-season, the coolers were removed from the 2005 Dodges and the trucks were used to transport seasonings for Cajun Shaker, which was a part of Broubar. After Broussard sold part of Cajun Shaker, Broubar began billing Cajun Shaker if the trucks made special trips to deliver seasonings. Broussard or a manager was asked before equipment or a vehicle was borrowed from any entity.
 

 A CPA did separate tax returns for all the entities. The CPA also did separate quarterly reviews and financial statements.
 

 Broubar held informal shareholder meetings in which Broussard and his wife, and his children involved in the corporation, met to discuss Broubar. Minutes were not kept of these meetings.
 

 The record does not support Progressive’s theory that Broussard’s businesses operated as a single business enterprise. The trial court correctly found that Progressive was the primary liability insurer for all damages sustained in the accident.
 

 J^DISCUSSION — QUANTUM
 

 The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration.
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257 (La.1993). The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages.
 
 Eddy v. Litton,
 
 586 So.2d 670 (La.App. 2d Cir.1991),
 
 writ denied,
 
 590 So.2d 1203 (La.1992).
 

 It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper.
 
 Dixon v. Tillman,
 
 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585,
 
 writ denied,
 
 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact.
 
 Manuel v. State Farm Mut. Auto. Co.,
 
 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
 

 Survival Damages
 

 Progressive complains that there was no evidence that Smith survived the accident even for an instant, and thus the award of $250,000.00 in damages on the survival action was excessive and should be reduced.
 

 | [fíA survival action, which compensates for the damages suffered by the victim from the time of injury to the moment of his death, differs from the wrongful death action, which compensates the beneficiaries for their own injuries which they suffer from the moment of the victim’s death and thereafter.
 
 Warren v. Louisiana Medical Mut. Ins. Co.,
 
 2007-0492 (La.12/2/08), 21 So.3d 186;
 
 Taylor v. Giddens,
 
 618 So.2d 834 (La.1993). Damages for a survival action may include the decedent’s pre-impact fear.
 
 See Thomas v. State Farm Ins. Co.,
 
 499 So.2d 562 (La.App. 2d Cir.1986),
 
 writs denied,
 
 501 So.2d 213, 215 (La.1987).
 

 If there is even a scintilla of evidence showing any pain or suffering by a victim prior to his death, damages are warranted in a survival action.
 
 King v.
 
 
 *473
 

 Brown Development, Inc.,
 
 43,827 (La.App.2d Cir.2/4/09), 4 So.3d 281,
 
 writ denied,
 
 2009-0499 (La.4/17/09), 6 So.3d 796.
 

 After Pruett saw the trailer collide with Brian’s car, Pruett pulled his car to the side of the road and caught his breath for a moment. He turned his truck around and drove it a short distance to where Brian’s car was located. Pruett exited his truck and ran down into a ditch to Brian’s car. He estimated this took no more than three or four minutes. One of Brian’s legs was cut off and he was not moving. The only sound he was making was the gurgling of blood, which sounded to Pruett like it was coming from Brian’s mouth. Pruett never checked to see if Brian had a pulse because he thought Brian was already dead.
 

 The Morehouse Parish Sheriff’s Department responded to a 9-1-1 call that was received at 8:01 a.m. concerning the accident. An ambulance was |17called at 8:09 and it arrived at 8:16. State Police were notified at 8:12, and State Trooper Mark Dennis arrived at 8:29. Trooper Dennis stated that because of the prevalence of cell phones, the time an accident is called in to 9-1-1 is generally used as the time of the accident.
 

 Trooper Dennis stated he could not determine the time of death. When Trooper Dennis was asked about the Deputy Coroner’s determination that the time of death was 8:01, Dennis responded that the Deputy Coroner asked what time he was using for the reported crash, and then used that time for the time of death. Trooper Dennis thought the Deputy Coroner arrived at the scene after him.
 

 Brian, who was 42, died in a horrific manner. The impact from the runaway trailer completely removed his door, the car’s “B-pillar,” and the left rear passenger door. The death certificate listed severe chest and abdominal trauma and head trauma as the causes of death. Brian was pronounced dead at the scene.
 

 According to the autopsy report, Brian sustained multiple injuries predominantly involving the chest and abdomen. His injuries included partial amputation of the left lower leg, multiple bilateral rib fractures with lacerations of both lungs and the pericardial sac, extensive lacerations of his liver and spleen, and multifocal areas of subarachnoid hemorrhage involving the brain.
 

 Brian was undoubtedly placed in great fear as he maneuvered his vehicle in an attempt to avoid the collision. The narrative from Trooper Dennis states that it appeared that Brian saw the trailer and attempted to |1smove his car to the right shoulder. The Altima came to rest in grass approximately 30 feet from the point of impact.
 

 Pruett heard gurgling sounds coming from Brian when he approached him several minutes after the accident. The record supports a finding that Brian did not die instantly, but briefly survived. Accordingly, the award of $250,000.00 in compensatory damages on the survival action was not an abuse of discretion.
 

 Wrongful Death Damages
 

 Progressive contends in the alternative that the award of wrongful death damages was excessive and should be reduced.
 

 The elements of damages for a wrongful death action are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses.
 
 Clark v. G.B. Cooley Service,
 
 35,675 (La.App.2d Cir.4/5/02), 813 So.2d 1273.
 

 Awards for lost future income, or support, are intrinsically insusceptible of calculation with mathematical certainty.
 
 Sledge v. Continental Cas. Co.,
 
 25,770 (La.App.2d Cir.6/24/94), 639 So.2d 805. Specu
 
 *474
 
 lation, probabilities, and conjecture cannot form the basis of the loss, which must be shown with reasonable certainty.
 
 Id.
 

 Brian was the 11th of 12 children, and the only child to finish a four-year college. He was considered the family’s leader and was active in organizing family reunions. His younger brother Randy looked up to him as a father figure. He was a mentor to all the family members, and he encouraged them in their endeavors. His death was and remains devastating 119to his family. One niece would sometimes even go to his grave to talk to him.
 

 Mrs. Smith was very close to Brian. Brian took her on vacation with him, and he went to church with her. She also went to his fraternity banquets with him.
 

 Mrs. Smith lived in Joiner, Arkansas, which is in the northeastern part of the state. Brian lived in Monroe, Louisiana. Mrs. Smith estimated that Brian drove to Joiner from Monroe at least 10 times a year, and he always came home for Christmas, Easter, and Mother’s Day.
 

 Brian helped his mother with her garden each year by tilling the ground and planting and maintaining the garden. His brother Stanley did a lot of upkeep around the house on a regular basis, but Brian paid for the equipment that Stanley used. His sister Beverly also helped to cut the grass and to keep the house clean.
 

 Randy Smith described his mother as being devastated and heartbroken after learning of Brian’s death. Randy thought his mother had both good and bad days since Brian was killed.
 

 Mrs. Smith has not sought counseling from a physician, but has sought comfort through prayer, and her faith has helped her persevere. Mrs. Smith looks at Brian’s picture and talks to him every day. She did not learn until after he died how much he had helped others.
 

 Randy related that he and his siblings were discussing getting together to buy a car for their mother because her car, a 1991 Ford Tempo, had stopped working, and she lacked the financial means to get a new car. |2oBrian, knowing his siblings’ financial conditions, took it upon himself to buy the car, a Nissan Altima, on his own. The cost of the Altima was $18,917.00. The purchase was financed for 60 months, so including the finance charge, the total cost was $22,416.00. There were to be 60 monthly payments of $373.60 each.
 

 Mrs. Smith did not know Brian had purchased the Altima for her. In fact, Brian was driving to Joiner to surprise her with the car when the tragic accident occurred.
 

 Mrs. Smith last saw Brian in person at her home on Mother’s Day, 2005. He had worked in her garden all day, and when she came home from church, she saw a check and card he had placed on her ironing board. The last time she spoke with him was when he called her house to speak to his brother after returning to Monroe that night. She received a phone call at 10:30 on the morning of the accident telling her that Brian had been killed. She had to go to the emergency room that night to receive a sedative.
 

 Randy related that his parents had lived in what was basically a shack. In 1998, they moved into a home that Brian had built for them. Brian paid the mortgage note and made sure the home was kept up. On June 5, 2003, a mortgage for $76,000.00 was taken on the house in Joiner. The note was for 30 years, with an interest rate of 6%. Not counting escrow, the monthly note was $455.66. At the time of Smith’s death, the note was $555.01.
 

 Mrs. Smith was born on April 18, 1930. Her husband died in 2001. Social Security was her only source of income. Brian was able to 12i financially help his elderly moth
 
 *475
 
 er because he was unmarried, had no children, and had a good job with Entergy. In the few years before his death, his annual salary ranged from $84,462.00 to $94,401.00. Randy testified that he and a sister in Illinois also gave their mother money, but Brian was her primary support system. Although Mrs. Smith’s other children helped her out after Brian died, their level of financial support does not approach what Brian provided to her.
 

 Randy related that Brian would try to meet whatever financial needs his mother had. Brian would give her money for the light bill if she was unable to pay it, and he gave her money for gas, but not on a monthly basis. In terms of regular monthly support, Brian paid the mortgage note and had an automatic monthly withdrawal of $150.00 from his checking account to Mrs. Smith. The automatic withdrawals began in May of 2004. Brian also paid for her medications.
 

 The record reflects that checks in the following amounts were written by Brian either to or on behalf of his mother: (i) $200.00 for gas on February 5, 2008; (ii) $500.00 for her birthday on April 18, 2003; (iii) $500.00 on April 25, 2003; (iv) $300.00 for an appraisal on May 12, 2003; (v) $110.00 to Bugmobile for a yearly inspection on June 30, 2003; (vi) $150.00 on September 22, 2003; (vii) $150.00 on December 1, 2003; (viii) $100.00 for Christmas on December 25, 2003; (ix) $400.00 on February 9, 2004; (x) $120.00 to Bugmo-bile for a yearly inspection on June 2, 2004; (xi) $20.00 to Bugmobile on June 25, 2004; (xii) $100.00 for a Christmas |⅞>£⅞ on January 7, 2005; and (xiii) $500.00 for Mother’s Day, Birthday, and gravel on May 8, 2005.
 

 Mrs. Smith explained that sometimes Brian gave her money because she needed it, and at other times he gave her money because he felt like doing it. She received money each month from Brian, but the amounts would vary. She recalled that he wrote her a check for $1,000.00 in 2000 just so she would have money.
 

 Mrs. Smith disagreed that except for the automatic withdrawal, payments to her would usually be for a gift marking a special day. She stated that whenever Brian came home, he normally gave her cash, in amounts ranging from $100.00 to $300.00.
 

 In the judgment of possession in Brian’s succession, Mrs. Smith was placed in possession of all his property, including his home in Monroe, the Joiner home, and a 2004 Ford F150 truck. She also received a check from the bank for $4,629.74, which was what remained in his checking account. She paid the mortgage on the Monroe home for eight months and then sold it in January of 2006 for a profit of $1,400.00. The furniture was given to family members. She still lives in the Joiner home, which remains burdened by a mortgage. She paid off the balance owed on the 2004 Ford truck and gave it to one of her sons. Her surviving sons bought a car for her.
 

 The trial court awarded $160,000.00 in damages for loss of support. At trial, the court heard testimony from expert economists Dr. W. Patton Culbertson, on behalf of Mrs. Smith, and Dr. Melvin Harju, on behalf of Progressive. Dr. Culbertson testified that he calculated the present, | ^discounted value of the loss of support to Mrs. Smith to be $162,000.00, which is close to the amount awarded by the court.
 

 Dr. Harju’s original estimates for loss of support ranged from $91,463.00 to $81,703.00, depending on the discount rate that he used. When making his original calculations, Dr. Harju did not take into
 
 *476
 
 account any allowance for a car, and he used a monthly stipend of $150.00.
 

 In reaching his figure of $162,000.00, Dr. Culbertson took into account monthly cash support of $250.00 (which included the $150.00 automatic withdrawal), the mortgage payment, and the payment of the car note. Dr. Culbertson mistakenly believed that the monthly car note was for $680.00 and had a term of 36 months. When it was pointed out that the car payments were spread over 60 months and the monthly car note was $373.00, he recalculated the loss of support to be $122,000.00.
 

 The trial court did not abuse its discretion in accepting Dr. Culbertson’s methodology. However, the trial court abused its discretion in not taking into account the adjustment for the lower car note. Accordingly, the award of $160,000.00 for loss of support is excessive, and we reduce this award to $122,000.00. In all other respects, the damage awards for the wrongful death claim are affirmed.
 

 DECREE
 

 With the award for loss of support reduced to $122,000.00, the judgment is AFFIRMED at appellant’s costs.
 

 AMENDED, AND, AS AMENDED, AFFIRMED.