SEXTON, Judge Pro Tem.
In this medical malpractice case, the jury found that Defendant, Willis-Knigh-ton Medical Center (“WK”), breached the standard of care in its treatment of Virginia Martin and awarded survival damages of $250,000, but no wrongful death damages or funeral expenses, following Ms. Martin’s death. WK appeals and Inter-vener, the Louisiana Patient’s Compensation Fund Oversight Board, joins in the appeal with WK. Plaintiffs, Ms. Martin’s 13 adult children, seek an affirmance of the award of survival damages and request damages for wrongful death and funeral expenses. For the reasons stated herein, we affirm the jury’s verdict on liability and award of survival damages. We amend the judgment to award $60,000 to each of *19 Ms. Martin’s children for the wrongful death of their mother and $6,833.72 for funeral expenses.

FACTS AND TESTIMONY

The 13 adult children[1] of Virginia Martin brought this medical malpractice action against WK for the treatment, and resulting death, of Ms. Martin in the emergency room of WK North on February 12, 2001. The critical factual issue concerns whether or not undiluted potassium (KCL) was administered IV push by Registered Nurse Debra Hansen[2] to Ms. Martin; causing acute cardiac arrhythmia and death.
Ms. Martin presented to the WK emergency room shortly before 7:00 p.m.[3] with complaints of abdominal pain, epigastric pain, vomiting and diarrhea. Her daughter, Betty Farmer, and Ms. Farmer’s boyfriend, Dr. Thomas Johnson,[4] were present in the treating room while Ms. Martin was treated in the ER. Ms. Martin was 69 years old and, by all accounts, was in good health prior to the ER visit. The record establishes that Ms. Martin had undergone a previous knee surgery and had been treated in November of the previous year for bronchitis and related muscle tenderness. She had no history of heart problems or complaints and the record contains no evidence of any other serious health-related issues.
The ER physician treating Ms. Martin was Dr. John Reeves. Dr. Reeves’ impression of Ms. Martin was that she was suffering from a simple gastroenteritis. Dr. Reeves ordered lab studies and a chest x-ray. The x-ray was done with a portable machine in the treatment room and the results were normal. An IV was started in Ms. Martin’s left arm and she received Toradol for pain and Phenergan for nausea shortly after 7:00 p.m. Initially, she responded well to the treatment. Ms. Martin’s blood pressure dipped, so Dr. Reeves ordered IV fluids (normal saline) for dehydration.
After confirming via Mini-hycel blood work that her creatinine level was normal, Dr. Reeves ordered a CT scan, with contrast,[5] of her abdomen to rule out an aortic aneurysm. According to the medical records, Ms. Martin left the ER treatment room for CT at 9 p.m. The CT scan was completed and the results indicated no aortic aneurysm and no other abnormalities of the abdomen that could have been the cause of Ms. Martin’s gastric distress.
While Ms. Martin was in the CT scan, the remaining lab results were reported to the ER department revealing that her po *20 tassium level was low (2.9).[6] The CBC indicated that Ms. Martin’s white blood cell count was slightly low, which, according to Dr. Reeves’ testimony, meant that she had a mild virus.
Nurse Hansen’s notes indicate that Ms. Martin returned from the CT scan to the ER treatment room at 9:35 p.m. At 9:40 p.m., Dr. Reeves visited Ms. Martin and ordered Demerol for pain and Phenergan for nausea, both to be administered IV push. Also at 9:40 p.m., Nurse Hansen’s notes indicate that Ms. Martin’s “IV infiltrated” and the cardiac monitor and oxygen were reapplied. The next entry, at 9:44 p.m., states that Ms. Martin’s face was mottled, she had a decrease in consciousness and Dr. Reeves was summoned. Nurse Hansen charted that, at 9:47 p.m., a Code was called and resuscitative efforts were started and attempted for 30 minutes, but failed. The only notation in the nurses notes on the ER chart regarding the administration of potassium to Ms. Martin is under the “Medications and IV s” section of the chart where Nurse Hansen wrote that Ms. Martin received 40 meq of KCL in 1000 units of saline (diluted potassium) at the rate of 150cc/hr “(sent from pharm[acy])” at 9:45 p.m.
Dr. Reeves’ dictation documents the events of Ms. Martin’s death as follows:
40 mEq of KCL was added to the patient’s bag of normal saline. Nurse had drawn up a small dose of Demerol and Phenergan to give her TV to help assist in her abdominal pain when she had a sudden drop in blood pressure, became apneic and heart rate markedly slowed, then became asystolic. I was in the ER when this occurred and several nurses were present when I was called to the room. Patient was intubated and resus-citative procedures begun.... Patient went from normal sinus rhythm before her arrest to bradycardia and asystole and finally developed a prolonged stage of PEA. (Emphasis added.)
Dr. Reeves continued in his dictation by noting the normal chest x-ray, the unremarkable abdominal films for obstruction and clear lungs and breathing indicating no pneumothorax. Dr. Reeves testified at trial that, during her initial treatment, he had ruled out all of the more serious potential causes of Ms. Martin’s symptoms. He further opined that, prior to the unexplained cardiac arrest, he believed Ms. Martin was responding to treatment, was stable and was going to be released the following day.
Ms. Martin’s cause of death was listed as a) acute cardiac arrhythmia, b) arterio-sclerotic heart disease. Dr. Reeves ordered an autopsy, due to the “unknown reason for the cardiac arrest,” but the coroner would not perform an autopsy because the body had not been stored properly.
As previously stated, the events surrounding Ms. Martin’s unforeseen death are the center of this dispute. Ms. Farmer and Dr. Johnson were in the ER treatment room and each testified to a similar version of events. Ms. Farmer testified that, when her mother returned from CT, Nurse Hansen entered the room and stated, “here is what your mother needs ... potassium.” Nurse Hansen was holding three syringes of equal size. She administered the medications directly into Ms. Martin’s IV port and Ms. Martin began screaming that her arm was burning and went into seizure-like convulsions. Ms. Martin began foaming at the mouth. Ms. Farmer testified that she was screaming at the nurse to help her mother, but Nurse Hansen was more concerned with the IV *21 site. Ms. Farmer described the events in her testimony:
When my mom’s face started getting red and frothing out of the mouth and I was wiping her face, she was-I was telling [Nurse Hansen] I needed help because my mom wasn’t breathing. And she stayed at the bottom of the seat. She wouldn’t get up and come help me. She was too busy trying to get the IV out of her arm and put it in the other arm.
And I asked her what she was doing and she said “I’m changing her IV. I said, well, my mom needs help, she’s not breathing. And she stayed down there. She never got up. She stayed down there and was putting the IV in the other arm. And I had to tell [Dr. Johnson] to go get Dr. Reeves to come in the room to help and he ran in there[ — ]
At that point, Ms. Martin coded and Ms. Farmer and Dr. Johnson were forced to leave the treatment room. They were soon asked to wait in the “Family Room,” at which point Ms. Farmer knew that her mother had died.
Dr. Johnson’s deposition was read to the jury at trial. His testimony echoes that of Ms. Farmer. He described his friendship with Ms. Martin and stated that he was by her side the entire time she was in the ER (other than when she was in the CT scan). Dr. Johnson described the events after Ms. Martin returned from the CT scan as follows:
There was — Virginia was still feeling poorly, and they brought in some more medication for her to take.
There were three syringes on a tray and the nurse injected the syringes in there, and then Virginia started writhing in pain, and her face flushed or got really red, like beet red, and then her arm was hurting her a lot.
I was really holding her down restraining her very physically, and her eyes started rolling back in her head, and during that time I was yelling at [Nurse Hansen] to get somebody, and Beverly was, too, and then Beverly was — I started to kind of lose it, and so Beverly asked me to get her a cloth for her face, and she kept — Beverly kept saying, “she is not breathing, she is not breathing,” and I could see she wasn’t breathing, and I asked [Nurse Hansen], “Please help us. Get somebody.” And she was doing whatever she was doing. She was still in the room.
I got the rag, and then after that I ran out of the room and yelled in the hallway, “We have an emergency.” ... I think I was yelling for Dr. Reeves[ — ]
Dr. Johnson further testified that Nurse Hansen told him and Ms. Farmer that the syringes contained Demerol, Phenergan and potassium. Dr. Johnson testified that he observed Nurse Hansen administer all three medications directly into the IV site (IV push). He testified that, within 60 seconds of the push of medications, Ms. Martin’s eyes were rolling back, she was frothing at the mouth and convulsing and, within 90 seconds of the medication, Ms. Martin was no longer breathing. During this time, according to Dr. Johnson, Nurse Hansen was “over on the right arm trying to set up another IV.”
Plaintiffs maintain that the IV push of potassium caused the IV infiltration, the burning on Ms. Martin’s arm and the cardiac arrest. There are photographs in the record of Ms. Martin’s left arm taken at the funeral home that show an area of dark bruising at the IV site.
Dr. Walter Simmons was qualified as an expert in emergency room medicine and testified on behalf of Plaintiffs. Dr. Simmons thoroughly described the mechanism of the heart and the effect thereon of *22 undiluted potassium. He stated that potassium is very caustic and would cause significant pain and burning in the vein, like putting acid in the vein. He further explained that potassium disrupts the electrical activity that controls a normal heart rhythm and that the heart basically cannot function when an imbalance of potassium inside and outside the cells exists. Dr. Simmons termed IV push of undiluted potassium a “never event” because it is fatal. Dr. Simmons stated unequivocally that the reaction of Ms. Martin as witnessed and described by Ms. Farmer and Dr. Johnson is consistent with IV push of undiluted potassium. He emphasized that “[t]here’s generally an inciting event that causes the arrhythmia. It doesn’t just spontaneously happen.” In Dr. Simmons’ expert opinion:
... [t]he patient came in with a fairly benign nonlife-threatening complaint to the emergency department of gastroenteritis. She was admitted to the hospital. At that time, she received medications, which in my opinion, included undiluted potassium and I think it caused her to have an acute arrhythmia and in turn was fatal.
In addition, Dr. Simmons noted, as recognized by Dr. Reeves, that Ms. Martin was initially responding well to treatment. Specifically, her blood pressure was stabilizing with the IV fluids and she was noted to be alert and responsive until she returned to the ER from CT.
Finally, Dr. Simmons brought to light the inaccuracies of both Nurse Hansen’s medical charting of Ms. Martin’s treatment in the ER and the pharmacy records purportedly showing the medications ordered by Dr. Reeves, and which left the pharmacy for Ms. Martin’s treatment. There are discrepancies between what medications were filled and what medications were actually given to the patient. Dr. Simmons opined that the records were “very sloppy work” and agreed that the records “were not an accurate representation of the medication history” of Ms. Martin. Specifically, the pharmacy record contains two entries indicating that potassium was filled for Ms. Martin. The first entry states that, at 8:32 p.m., 40 mEq (20mls) was mixed in 1000 ml bag of saline. The second entry states that, at 9:59 p.m., 40 mEq (20mls) was mixed in a 250 ml bag of saline for Ms. Martin.[7] Dr. Simmons noted that, when compared with the medical records, it is impossible to reconcile the times with the administration of the first bag of diluted potassium and impossible to determine what happened to the second dose of potassium — it is not accounted for in the charting of treatment for Ms. Martin. As previously mentioned, in Dr. Simmons’ expert opinion, the medical records are simply inaccurate.
Dr. Simmons also opined that the hospital’s lack of written policy regarding the handling of undiluted potassium was well below the standard of care. In this regard, he noted the testimony of WK Pharmacy Director, Tessa Albritton. Ms. Al-britton testified that, in February 2000, there had been a directive that all potassium be removed from all patient care areas because of its lethal nature if administered undiluted to patients. In order to comply, the Pharmacy and Therapeutic Committee directed that potassium be removed from the Pyxis machines[8] on the floors and sent a memo to the staff regarding the nature *23 and proper administration of potassium. Dr. Simmons opined that the lack of a written policy regarding the handling of potassium was below the standard of care for the hospital.
Ms. Albritton also testified that, if undiluted potassium is dispensed, the pharmacist takes it to the floor and injects it into the saline IV bag. She testified that that did not happen in this case — that all potassium ordered for Ms. Martin was diluted in saline prior to leaving the pharmacy. Significantly, however, this testimony established that pharmacists do provide undiluted potassium in syringes for adding to patients’ IV bags on the floor. He also agreed that Ms. Albritton’s affidavit (given in response to the Medical Review Panel inquiry) states that the only way a nurse can get undiluted potassium is from the pharmacy.
Plaintiffs also presented the expert testimony of Registered Nurse JoAnne Gongo-ra. Nurse Gongora reviewed the charting done by Nurse Hansen and noted that there were times changed, written over, some actions were initialed while others were not, and that there is a section of the charting that is more of a narrative statement and appears to have been completed after the treatment was given. Nurse Gongora opined that the charting was not the standard method of charting. She agreed with Dr. Simmons that the medical records contained timing inaccuracies and the pharmacy record was inconsistent with the patient’s chart regarding medications. Nurse Gongora also agreed that there was a dose of potassium that was dispensed from the pharmacy that was not accounted for in the patient’s chart.
In summary, Plaintiffs suggest that Nurse Hansen was able to obtain a syringe of undiluted potassium from the pharmacy which, according to Dr. Reeves’ dictation, was to be added to Ms. Martin’s IV bag that was already hung. She entered the room with syringes of Demerol, Phenergan and potassium and, through inadvertence or inattentiveness, administered the potassium IV push instead of adding to the bag of saline, causing Ms. Martin’s heart to become arrhythmic and eventually resulting in her death.
WK argues that Ms. Martin’s IV site infiltrated during the CT scan; and, therefore, she could not have been given any medication or potassium via her IV line as suggested by Ms. Farmer. WK notes Nurse Hansen’s charting that, at 9:44, the IV had infiltrated. Testimony established that the contrast used during a CT scan can be caustic to the vein and cause infiltration. According to WK, if any medication would have been pushed into the infiltrated IV port, the medication would have entered the surrounding tissue rather than the vein; it would not have gone directly to the heart as suggested by Plaintiffs. Recall, however, that the CT scan was completed successfully and there is no notation that Ms. Martin complained of pain or burning of the IV site when the contrast was administered and no notation from CT that the IV had infiltrated.
WK also argues that undiluted potassium was not available in the ER at the time Ms. Martin died. It relies on the testimony of Ms. Albritton as described above. In addition, it was this point that led the medical review panel to conclude that there was no breach of the standard of care. After reviewing the case, the review panel requested evidence regarding the availability of undiluted potassium to the ER nursing staff. WK provided the panel with the affidavit of Ms. Albritton, referenced earlier. This affidavit stated, in pertinent part:
On February 12, 2001, undiluted potassium was not available to the nurses in the emergency room at Willis-Knigh- *24 ton Medical Center North. The only way a nurse could obtain undiluted potassium was through the pharmacy.
Ms. Albritton also stated that the pharmacy mixed two doses of 40 mEqs of potassium in saline for Ms. Martin in the pharmacy and that potassium was not available to the nurses in the Pyxis machine.
Based on this affidavit and the pharmacy records, and without the benefit of the evidence presented at trial, the medical review panel found that there was “no evidence that undiluted potassium was available in the emergency department at the time in question.” Two members of the medical review panel, Drs. Todd Tho-ma and Jared Schaan, testified at trial. Each of the doctors corroborated the opinion of Plaintiffs' expert Dr. Simmons regarding the caustic and fatal effects of giving undiluted potassium IV push. The doctors also agreed that the reaction of Ms. Martin as described by Ms. Farmer and Dr. Johnson would be consistent with the patient having received IV push potassium. Drs. Thoma and Schaan explained that they did not make a decision in this matter at the first meeting of the panel because they needed information on whether undiluted potassium was available to the nurse in the ER. The panel requested information on this “pivotal” question and, as stated, were provided the affidavit of Ms. Albritton. When questioned about the inaccuracies in the pharmacy records, both doctors acknowledged that the second dispensation of 40 mEqs of potassium as reflected in the record does not appear anywhere else in the medical records, i.e., it is not documented as having been given or destroyed.
Again, in her trial testimony, Ms. Albrit-ton reluctantly agreed that undiluted potassium was obtainable from the pharmacy and could have left the pharmacy in a syringe. She maintained, however, that the pharmacy record did not contain an entry that undiluted potassium had been given to Nurse Hansen for Ms. Martin in this case.
Dr. Reeves testified that he did not time his orders for medication in the records. He further testified that, according to the medical record, a 1000 ml bag of saline with 40 mEqs of KCL was hung at 8:45 p.m. However, his dictation indicates that he did not order potassium for Ms. Martin until after she returned to her ER treatment room from CT, which was 9:35 p.m. He acknowledged the inaccuracies of time in the record.
Dr. Reeves further testified from the medical record that the IV infiltrated at 9:45 p.m.; therefore, no medications could have been administered IV push as Plaintiffs suggest. When asked about his orders to add potassium to the IV bag already in place, he testified that he was unaware that potassium was no longer available to the nurses in the ER at the time. Dr. Reeves stated that, since potassium was not available, Nurse Hansen would have replaced the normal saline bag with the KCL mixed bag from the pharmacy and discarded the unused normal saline bag.
Nurse Hansen also testified on behalf of WK. She defended her method of charting, including the instances where she crossed out and wrote over words. She stated that she had trouble with military time and had to correct the times in several places on the chart. Nurse Hansen testified that her notes and times were accurate. She related that she hung a bag of normal saline at 8:00 p.m. and then replaced that bag with the bag of mixed saline and potassium at 8:45 p.m. Nurse Hansen stated that she discarded the unused portion of the bag of normal saline. According to Nurse Hansen, Dr. Reeves ordered the potassium she hung at 8:45 *25 p.m. (no order in the medical records) and she did not give any other potassium at any time to Ms. Martin. Nurse Hansen testified that Dr. Reeves’ dictation is incorrect when it indicates that he did not order potassium until after Ms. Martin returned from CT.
Nurse Hansen then testified that Dr. Reeves ordered Demerol and Phenergan at 9:40 p.m., which she retrieved from the Pyxis machine. She had a third syringe of normal saline to flush the IV line. Nurse Hansen explained that she noticed the IV had infiltrated at 9:40 p.m.; and, therefore, the Demerol and Phenergan could not be administered IV push. She suggested that the contrast from the CT scan infiltrated the IV. According to Nurse Hansen, four minutes later, she charted that Ms. Martin’s face became mottled and her condition began rapidly deteriorating.
Nurse Hansen adamantly denied that she gave Ms. Martin undiluted potassium IV push. She stated that Ms. Farmer and Dr. Johnson were lying when they testified that she entered the room and told them that she had what Ms. Martin needed— potassium.
In summary, WK seeks a reversal of the jury’s verdict on liability and its award of survival damages. WK relies on the medical records and maintains that undiluted potassium was not available to Nurse Hansen on the day Ms. Martin died. It emphasizes the testimony that establishes that there can be multiple causes of cardiac arrhythmia and argues that the jury erred in finding that WK breached the standard of care in its treatment of Ms. Martin. Plaintiffs also appealed seeking additional damages for wrongful death and funeral expenses.

DISCUSSION

Breach of the Standard of Care

Appellate review of the trial court’s findings in a medical malpractice action is limited. Prine v. Bailey, 45,815 (La.App.2d Cir.12/15/10), 56 So.3d 330. If the record, when read in its entirety, supports the fact finder’s conclusions and those conclusions are reasonable, an appellate court cannot reverse or modify the trial court’s judgment based on those factual conclusions. An appellate court can only reverse a fact finder’s determinations when: (1) it finds from the record that a reasonable factual basis does not exist for the findings of the trial court, and (2) it further determines that the record establishes that the findings are manifestly erroneous. Id., citing Lovelace v. Giddens, 31,493 (La.App.2d Cir.2/24/99), 740 So.2d 652, writ denied, 99-2660 (La.11/24/99), 750 So.2d 987. When expert opinions contradict concerning compliance with the applicable standard of care, the trial court’s conclusions will be granted great deference. It is within the province of the fact finder to evaluate the credibility of such experts and their testimony. Turner v. Stassi, 33,022 (La.App.2d Cir.5/10/00), 759 So.2d 299; King v. State ex rel. Dept. of Health and Hosp., 31,651 (La.App.2d Cir.2/24/99), 728 So.2d 1027, writ denied, 99-0895 (La.5/07/99), 741 So.2d 656; Pinnick v. Louisiana State Univ. Med. Center, 30,263 (La.App.2d Cir.2/25/98), 707 So.2d 1050.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Further, when findings are based on determinations regarding credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Id. Only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the *26 listener’s understanding and belief in that which is said. Orea v. Scallan, 32,622 (La.App.2d Cir.1/26/00), 750 So.2d 483.
A medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant’s standard of care, (2) the defendant’s breach of that standard of care, and (8) a causal connection between the breach and the claimant’s injuries. La. R.S. 9:2794(A); Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228; Bamburg v. St. Francis Med. Center, 45,024 (La.App.2d Cir.1/27/10), 30 So.3d 1071, writ denied, 10-0458 (La.4/30/10), 34 So.3d 294.
Malpractice claims against a hospital are subject to the general rules of proof applicable to any negligence action. Moore v. Willis-Knighton Med. Center, 31,203 (La.App.2d Cir.10/28/98), 720 So.2d 425. A plaintiff must prove that the defendant had a duty to protect against the risk involved, that the defendant breached its duty and that the plaintiffs injury was caused by the defendant’s conduct. Smith v. State, through Dept. of Health and Human Res., 523 So.2d 815 (La.1988); Moore, supra.
Hospitals are held to a national standard of care. The locality rule does not apply to hospitals. Henderson v. Homer Memorial Hosp., 40,585 (La.App.2d Cir.1/27/06), 920 So.2d 988, writ denied, 06-0491 (La.5/5/06), 927 So.2d 316. Hospitals are bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may require. Id. The mere fact that an injury occurs or an accident happens raises no presumption or inference of negligence on the part of the hospital. Galloway v. Baton Rouge Gen. Hosp., 602 So.2d 1003 (La.1992).
It is well settled that a hospital is liable for its employee’s negligence, including doctors and nurses, under the re-spondeat superior doctrine. Benefield v. Sibley, 43,317 (La.App.2d Cir.7/9/08), 988 So.2d 279, writs denied, 08-2162, 08-2210, 08-2247 (La.11/21/08), 996 So.2d 1107, 1108. Nurses who perform medical services are subject to the same standards of care and liability as are physicians. Id. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, along with his or her best judgment, in the application of his or her skill to the case. Little v. Pou, 42,872 (La.App.2d Cir.1/30/08), 975 So.2d 666, writ denied, 08-0806 (La.6/6/08), 983 So.2d 920.
In the case sub judice, it is undisputed that the administration of undiluted potassium IV push falls below the standard of care. As previously stated, the jury in this case found by a preponderance of the evidence that Nurse Hansen breached the standard of care in her treatment of Ms. Martin by injecting undiluted potassium directly into the IV port, which caused the cardiac arrhythmia that resulted in Ms. Martin’s death. Our review of the record, as described above, reveals a reasonable basis for this conclusion.
First, the jury heard repeated testimony concerning the inaccuracy of the medical records and the inconsistencies between the pharmacy records and the medical records. Second, Ms. Albritton’s testimony was subject to differing interpretations regarding the availability of undiluted potassium to nurses from the pharmacy. In addition, there was no written policy dictating the handling of undiluted potassium; rather the staff was informed via internal memo in February 2000 that undiluted potassium would no longer be available in patient care areas. Ms. Albritton, however reluctantly, testified that undiluted potassium was available from the pharma *27 cy. Moreover, Dr. Reeves testified that he was unaware that undiluted potassium was not supposed to be available to ER nurses and he ordered that the potassium be added to the bag of normal saline that had already been hung. Third, all witnesses, albeit some reluctantly, testified that there was a 40 mEq dose of potassium dispensed in the pharmacy, but not accounted for in the medical chart as being given to the patient or discarded. Finally, all expert witnesses, including Drs. Thoma and Schaan, agreed that Ms. Martin’s sudden cardiac arrhythmia and the reactions as described by Ms. Farmer and Dr. Johnson were consistent with the patient having received undiluted potassium IV push. Collectively, this evidence could reasonably lead a fact finder to conclude that undiluted potassium was available to Nurse Hansen from the pharmacy and was administered IV push to Ms.- Martin.
Furthermore, the jury clearly made a credibility determination in accepting as true the testimony of Ms. Farmer and Dr. Johnson regarding Nurse Hansen’s actions and the reaction of Ms. Martin almost immediately after medication was injected in the IV port. In doing so, the jury rejected the testimony of Nurse Hansen. The jury is afforded great deference in making such credibility determinations and we find no abuse of that discretion in the present case. We also are bound to give great deference to the jury’s decision to credit Dr. Simmons’ expert testimony over any contradictory testimony of other expert witnesses. Turner, supra; Pinnick, supra. Accordingly, we will not disturb the jury’s verdict on liability.

Survival Damages

In the determination of general damages, the discretion vested in the trier of fact is “great” and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2824.1. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Benefield, supra; Hargroder v. Unkel, 39,009 (La. App.2d Cir.10/29/04), 888 So.2d 958, writs denied, 04-2908, 04-2909 (La.2/4/05), 893 So.2d 874.
In addition, only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff, which reasonably could have been made by the trier of fact. Benefield, supra; Hargroder, supra.
Survival damages may be awarded for the pre-death mental and physical pain and suffering of the deceased. In determining survival damages, the fact finder should consider the severity and duration of any pain or any pre-impact fear experienced by the deceased, and any other damages sustained by the deceased up to the moment of death. Simmons v. Christus Schumpert Med. Center, 45,908 (La.App.2d Cir.6/15/11), 71 So.3d 407, writs denied, 11-1592, 11-1591 (La.10/7/11), 71 So.3d 317, 318. Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear or mental anguish during an ordeal leading to the *28 death is compensable. Id. The question of whether the decedent actually consciously suffered is a factual issue, governed by the manifest error-clearly wrong standard. Id.
Ms. Martin experienced a horrific event which started with intense burning and pain in her arm and erratic heartbeat. She began frothing at the mouth and having seizure-like convulsions. Ms. Farmer testified that her mother was looking at her with a pleading look on her face as if she was begging for help. She slowly lost consciousness and suffered a complete cardiac failure. While the award of $250,000 in survival damages is toward the top of the range in this type of case, we cannot say that the award is an abuse of the jury’s great discretion in fashioning such awards.

Wrongful Death Damages and Funeral Expenses

Plaintiffs argue that it was error for the jury to award survival damages without awarding damages for wrongful death and for failing to award funeral expenses. This argument has merit.
In a wrongful death action involving allegations of medical malpractice, a plaintiff may establish a compensable claim through evidence which demonstrates that a defendant’s medical malpractice resulted in the loss of a chance of survival of a patient who thereafter expired. Smith v. State through Dept. of Health & Human Res., supra. The elements of damages for a wrongful death action are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Smith v. Louisiana Farm Bureau Cas. & Ins. Co., 45,013 (La. App.2d Cir.4/23/10), 35 So.3d 463, writ denied, 10-1205 (La.9/17/10), 45 So.3d 1052.
The testimony established that each of Ms. Martin’s 13 adult children enjoyed a close and loving relationship with their mother. Each child testified to frequent activities and talks with their mother; and, according to the testimony, Ms. Martin spent an inordinate amount of love and energy helping and supporting her children in different ways. By all accounts, Ms. Martin was the common thread and consummate matriarch for this family. Based on this record, we find that an award of $60,000 to each of Ms. Martin’s 13 children is appropriate.
Finally, based on the documentary evidence introduced by Plaintiffs from Well-man Funeral Home, we award funeral expenses in the amount of $6,833.72.[9]

DECREE

For the foregoing reasons, the judgment in favor of Plaintiffs, Beverly Farmer, Individually and as the Provisional Tutrix of Ms. Martin, Paul Sepulvado, Jerry Sepul-vado, Billy Sepulvado, John Sepulvado, Marvin Sepulvado, Raymond Irvin, Joseph Sepulvado, Janet Cassidy, Patricia Steadman, Wanda Sepulvado, Margie Eades and Martha Wall, and against Defendant Willis-Knighton Medical Center, is affirmed. The award of survival damages in the amount of $250,000 is affirmed. The portion of the judgment denying damages for wrongful death is amended to award each of Virginia Martin’s 13 children $60,000 and to award $6,833.72 in funeral expenses. Costs of appeal are assessed to Defendant Willis-Knighton Medical Center.
*29 AMENDED AND, AS AMENDED, AFFIRMED.

. Plaintiffs include Beverly Farmer, Individually and as the Provisional Tutrix of Ms. Martin, Paul Sepulvado, Jerry Sepulvado, Billy Sepulvado, John Sepulvado, Marvin Sepulva-do, Raymond Irvin, Joseph Sepulvado, Janet Cassidy, Patricia Steadman, Wanda Sepulva-do, Margie Eades and Martha Wall.

. Nurse Hansen worked full time as a nurse in Coushatta, Louisiana, and did sporadic relief work in Shreveport for WK.

. The medical records are in military time; for clarity and ease of reading, references to time in this opinion have been converted to standard time.

. Dr. Johnson is a chiropractor and he and Ms. Farmer were in a relationship at the time of Ms. Martin’s death. The record reveals that Dr. Johnson shared a close friendship with Ms. Martin prior to her death. He testified that the effects of Ms. Martin's passing on Ms. Farmer were tremendous and put a strain on the relationship. The two were no longer in a relationship by the time discovery was taken.

. A CT scan with contrast requires IV administration of iodine, which makes the aorta show up well and highlights abnormalities such as an aneurysm.

. The earlier Mini-hycel did not include a potassium level.

. Interestingly, this entry is timed after the Code had been called for Ms. Martin.

. Pyxis machines are located in patient care areas and contain medications that nurses can quickly obtain by entering the patient’s identifying information. Medications dispensed from the Pyxis is automatically documented in the pharmacy records by computer.

. In light of our holding herein, we pretermit any discussion of WK’s assignment of error challenging the denial of its Motion for JNOV and, alternatively, New Trial and/or Remitti-tur.