LOLLEY, J.
 

 |! Donna Keeslar, the widow of Myron “Dale” Keeslar, appeals two rulings of the 4th Judicial District Court, Parish of Oua-chita, in favor of J.B. “Duke” McHugh, Jr., M.D. For the following reasons, we affirm the trial court’s judgment.
 

 Facts
 

 Myron “Dale” Keeslar, a 52-year-old man, presented at the Emergency Room of Glenwood Regional Medical Center (“Glen-wood”) at 10:17 a.m. on February 13, 2001. He complained of intermittent abdominal pain, cold sweats, and shortness of breath. During the day, Dr. Billy Alexander, the emergency room physician, called in a gas-troenterologist, Dr. J.B. “Duke” McHugh, for a consultation. Dr. McHugh arrived at approximately 6:30 p.m. and examined Mr. Keeslar and reviewed the test results that had been ordered and received by Dr. Alexander. After considering Mr. Kees-lar’s x-ray, Dr. McHugh’s first impression was “severe constipation,” and he admitted Mr. Keeslar to the hospital, primarily because he had been administered a sedative. Around 10:30 p.m., the nursing staff informed Dr. McHugh that Mr. Keeslar’s oxygen level had dropped and he was having respiratory problems. Dr. McHugh called for a consult by a pulmonologist, Dr. Thomas Gullatt, who came and intubated the patient. Mr. Keeslar was moved to the intensive care unit. Dr. McHugh left the hospital for the evening, leaving the patient in the care of Dr. Gullatt. Later that night, at approximately 2:00 a.m., Dr. Gullatt consulted the general surgeon, Dr. Russell Lolley. Dr. Lolley wanted to take the patient into emergency surgery, but he was too unstable. By 10:30 on the morning 12of February 14, Mr. Keeslar had stabilized enough for surgery, during which Dr. Lolley discovered a clot that had lodged in the mesenteric artery in the abdomen, cutting off blood flow to the colon. Resultantly, the colon had died and was gangrenous. Dr. Lolley attempted to save the patient by removing his colon, but Mr. Keeslar died on February 16.
 

 
 *935
 
 Mr. Keeslar’s widow, Donna, brought the case against Dr. McHugh to the Medical Review Panel (“MRP”), which, after reviewing the evidence, concluded that Dr. McHugh had breached the applicable standard of care as to Mr. Keeslar. The panel determined that:
 

 It is the opinion of the panel that there is evidence that Dr. McHugh failed to meet the standard of care expected of him in his treatment of Myron Keeslar in that he failed to make the diagnosis of a possible ischemic bowel and recognize the life threatening nature of that diagnosis in a timely manner.
 

 Subsequently, Mrs. Keeslar filed a motion for summary judgment at the trial court, requesting that it find that liability had been established by the MRP and order a trial for damages only. Her motion was granted and judgment was entered in her favor, with the trial court determining that a breach of the standard of care had occurred. There was no finding, however, that Dr. McHugh’s actions had caused the death of Mr. Keeslar.
 

 Subsequently, the original trial court judge presiding over the case, Judge Di-mos, retired and Judge C. Wendell Manning was elected to the bench and presided over the case. Dr. McHugh filed a motion to reconsider the grant of Mrs. Keeslar’s motion for summary judgment. After a hearing, the trial court overturned the pri- or court’s summary judgment in favor of Mrs. Keeslar, and the matter proceeded to trial. After the trial, the jury | ..¡concluded that Dr. McHugh did not breach the medical standard of care, and judgment was entered in favor of Dr. McHugh. Mrs. Keeslar appeals that judgment.
 

 Discussion
 

 Summary Judgment
 

 In her first assignment of error, Mrs. Keeslar argues that the trial court erred in reconsidering and then denying her motion for summary judgment. She maintains that Dr. McHugh’s motion to reconsider the summary judgment was akin to a motion for new trial, and argues that pursuant to La. C.C.P. art. 1972, a motion for new trial requires the discovery of evidence important to the case which could not be obtained prior to the trial. She states that no new evidence was introduced that warranted a reconsideration of the previously granted summary judgment.
 

 As stated, Judge Dimos originally presided over Mrs. Keeslar’s lawsuit against Dr. McHugh, and he partially granted her motion for summary judgment, concluding only that Dr. McHugh had breached the standard of care. The trial court made no determination regarding whether that breach actually caused the patient’s death. The partial final judgment was designated a final judgment by the trial court, which Dr. McHugh appealed. After a
 
 de novo
 
 review of the trial court’s certification of the judgment, this court determined that the trial court erred in certifying its judgment as suitable for immediate appeal, and the appeal was dismissed. Upon Dr. McHugh’s request, the trial court reconsidered the summary judgment and denied it.
 

 |4We do not agree with Dr. McHugh’s characterization of the partial summary judgment as merely an interlocutory judgment. Pursuant to La. C.C.P. art. 1841, an interlocutory judgment does not “determine the merits but only preliminary matters in the course of the action.... ” Clearly, in this ease, the summary judgment originally rendered by Judge Dimos addressed the merits of this case, i.e., an element of liability. Thus, the judgment rendered by Judge Dimos was a partial judgment, albeit not final, as described in La. C.C.P. art. 1915(B)(2). However, sub
 
 *936
 
 section (B)(2) of the article also states that such a “decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.” Thus, we conclude that the trial court acted in accordance with the article and did not err in reconsidering and revising the previously granted summary judgment.
 

 Moreover, we note that the grant of summary judgment on a single element of La. R.S. 9:2794, the statute which sets out the elements to show liability in a medical malpractice claim, is improper.
 
 See Jones v. LSU Health Sciences Center-Shreveport,
 
 39,292 (La.App. 2d Cir.09/02/04), 880 So.2d 269. As stated in
 
 Jones:
 

 By dividing the issue of liability into smaller issues, the court’s judgment that the defendant breached the standard of care might be used at trial to preclude the introduction of evidence by the defendant regarding whether there was a breach in the standard of care and that breach caused the plaintiffs injury. There is possibility of confusion arising out of the factual interrelationship between the adjudicated element and the unadjudicated element that could lead to inconsistent rulings and piecemeal litigation.
 

 Id.
 
 at 270.
 

 IfiMrs. Keeslar also maintains that the trial court was correct when it partially granted her motion for summary judgment, in effect arguing that the trial court erred in subsequently denying her motion for summary judgment after the reconsideration. Initially, we point out that Mrs. Keeslar’s original motion for summary judgment sought relief on all claims. As discussed, the trial court under Judge Di-mos granted only the claims relating to Dr. McHugh’s breach of the standard of care — all other claims by Mrs. Keeslar were denied by the trial court. Ultimately, the trial court under Judge Manning denied Mrs. Keeslar’s motion for summary judgment, presumably including all claims — even those which had been previously denied. We do not believe the denial of Mrs. Keeslar’s motion for summary judgment was error.
 

 The appellate court’s review of a grant or denial of a summary judgment is
 
 de novo. Independent Fire Ins. Co. v. Sunbeam Corp.,
 
 1999-2181, 1999-2257 (La.02/29/00), 755 So.2d 226;
 
 Hinson v. Glen Oak Retirement Home,
 
 34,281 (La.App. 2d Cir.12/15/00), 774 So.2d 1134. The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action allowed by law.
 
 See
 
 La. C.C.P. art. 966(A)(2);
 
 Hin-son v. Glen Oak Retirement Home, supra.
 
 A motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
 

 [ fiHere, despite the MRP’s finding that Dr. McHugh breached the standard of care, there was no conclusive determination that his actions caused the patient’s death, the other necessary element to prove liability in a medical malpractice case. Thus, the MRP left open the factual issue as to whether Dr. McHugh’s actions caused the death. We believe that this factual issue precluded summary judgment on the issue of liability in this case. In opposition to Mrs. Keeslar’s motion for summary judgment, Dr. McHugh offered his own deposition wherein he maintained his position that his care met the applicable standard of care (despite the MRP’s conclusion to the contrary) and that his actions did not cause the patient’s death. Obviously, Dr. McHugh’s affidavit is self-serving; however, he also offered the affi
 
 *937
 
 davit of Dr. Claude Minor, a general surgeon, who opined that the care and treatment rendered by Dr. McHugh did not result in the patient’s death. Although Dr. Minor was not a gastroenterologist, considering the nature of the patient’s medical ailment and the integral part played by a general surgeon in the diagnosis and treatment of such, we believe that Dr. Minor’s opinion as to Dr. McHugh’s treatment and the cause of the patient’s death was sufficient to raise a genuine issue of material fact on the issue of liability. Thus, the trial court properly denied Mrs. Keeslar’s motion for summary judgment.
 

 Breach of Standard of Care
 

 Finally, in her third assignment, Mrs. Keeslar argues that the jury’s verdict was in error in finding that Dr. McHugh did not breach the standard of care when all of the evidence, she maintains, was to the contrary. We disagree.
 

 |7The jury’s finding in a medical malpractice case is subject to manifest error review; it cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong.
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993);
 
 Tanner v. Cooksey,
 
 42,010 (La.App. 2d Cir.04/04/07), 954 So.2d 335,
 
 writ denied,
 
 2007-0961 (La.06/22/07), 959 So.2d 508. In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding; and, (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently.
 
 Pinsonneault v. Merchants & Farmers Bank & Trust Co.,
 
 2001-2217 (La.04/03/02), 816 So.2d 270.
 

 Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination.
 
 Sto-bart, supra.
 
 But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
 
 Salvant v. State,
 
 2005-2126 (La.07/06/06), 935 So.2d 646.
 

 |RIn a medical malpractice case, the plaintiff has the burden of proving:
 

 (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
 

 (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
 

 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plain
 
 *938
 
 tiff suffered injuries that would not otherwise have been incurred.
 

 La. R.S. 9:2794(A). Resolution of each of these inquiries is a determination of fact which should not be reversed on appeal absent manifest error.
 
 Martin v. East Jefferson General Hosp., 582
 
 So.2d 1272 (La.1991);
 
 Tanner, supra.
 

 Where there are conflicting expert opinions concerning the defendant’s compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact.
 
 Pinnick v. Louisiana State University Medical Center,
 
 30,263 (La.App. 2d Cir.02/25/98), 707 So.2d 1050.
 

 In the case
 
 sub judice,
 
 the jury heard and considered the testimony of Dr. Michael Townsend, Dr. Thomas Lieberman, Dr. Thomas Gullatt, Dr. Russell Lolley, Dr. McHugh, Dr. Claude Minor, and Dr. David Scott.
 

 \9Plaintiffs experts
 

 The first witness called by the plaintiff was Dr. Michael Townsend, a general surgery physician hired by Mrs. Keeslar to review the medical records and give an expert opinion. Dr. Townsend specialized in general surgery and surgical critical care. Dr. Townsend testified that the standard of care for a patient like Mr. Keeslar would have required a surgeon to have been brought in at 10:00 p.m. at the very latest for the patient to have survived. However, Dr. Townsend also testified that in his experience, ischemic bowel is most commonly not diagnosed definitively before surgery.
 

 The plaintiff also called Dr. Thomas Lieberman, a gastroenterologist who had not been personally involved in the patient’s care, but had reviewed the records for purposes of forming an expert opinion. Like Dr. Townsend, Dr. Lieberman opined that Dr. McHugh had breached the standard of care in failing to timely diagnose the patient’s condition. However, Dr. Lieberman did acknowledge that ischemic bowel carries a high risk of death. He also stated that it would be common for ischemic bowel to present in a nonspecific manner which can be confused with other illnesses. He also stated that ischemic bowel generally can be a very hard diagnosis to make, unless the physician specifically thinks about it. Dr. Lieberman also agreed that Dr. McHugh had acted properly by admitting the patient into the hospital and consulting with the pulmonologist for the respiratory issues.
 

 Dr. Russell Lolley was also called by Mrs. Keeslar. Dr. Lolley was the general surgeon who performed surgery on Mr. Keeslar on February 14. |inDr. Lolley was called by Dr. Gullatt at approximately 2:00 a.m. When he first saw Mr. Keeslar, he was “on a ventilator and in shock and had a distended abdomen and his laboratory work showed that he was also acidotic.” At the time Dr. Lolley originally saw the patient, his condition was not stable enough for surgery. Dr. Lolley transfused him with large amounts of intravenous fluids and some plasma in an attempt to improve Mr. Keeslar’s general condition for surgery. According to Dr. Lolley, in order to truly make a diagnosis of ischemic bowel, surgery is necessary, and he was able to operate on Mr. Keeslar later that morning. Dr. Lolley opined that it is preferable to operate on ischemic bowel patients before complications from the illness set in, but he offered no explicit opinion regarding Dr. McHugh’s actions.
 

 Dr. Paul Jordan also testified on behalf of Mrs. Keeslar. Dr. Jordan, a gastroen-terologist, was a member of the MRP that reviewed this case, and he was on the gastroenterology department faculty of the Louisiana State University Health Sciences Center. Dr. Jordan stated that he
 
 *939
 
 had treated perhaps 20 ischemic bowel cases in his career and that one or two of those had survived. In fact, Dr. Jordan testified that the mortality rate for ischemic bowel was 80%. As to this particular case, Dr. Jordan noted the MRP’s finding that Dr. McHugh breached the standard of care as to Mr. Keeslar, specifically because it was believed that the diagnosis should have been made earlier on in the process. However, Dr. Jordan went on to state that ischemic bowel is probably the “biggest nightmare” for gastroenterologists, because it is “extremely difficult to make the diagnosis.” He also stated that the MRP did not feel that in this case the | n patient had the symptoms that would have allowed Dr. McHugh to make the diagnosis of is-chemic bowel, but that the earlier the gas-troenterologist makes the diagnosis and calls the surgeon, the better the rate of recovery. Finally, Dr. Jordan noted that the MRP could not determine whether Dr. McHugh’s conduct was a factor in causing the patient’s death.
 

 Defendant’s experts
 

 Dr. Thomas Gullatt, an intensivist and pulmonologist, treated Mr. Keeslar after he was admitted at Glenwood and when Dr. McHugh called him in as a consult around 10:25 that evening. Dr. Gullatt’s first treatment of the patient was at approximately 11:25 p.m. He first noted that the patient had labored respirations and his oxygen saturations were low, which indicated to Dr. Gullatt a pulmonary problem. When Dr. Gullatt examined his abdomen, he noted it was distended; however, when he listened, he did not hear any bowel sounds. When he pressed the patient’s abdomen in different locations, there was no obvious tenderness. At that point, Dr. Gullatt did not see any indication of ischemic bowel. Dr. Gullatt noted that the patient did not have pain out of proportion to his physical symptoms and certainly not writhing pain — which would have been typical for a diagnosis of is-chemic bowel. However, he also testified that when Dr. Lolley examined the patient’s abdomen several hours later, he had a very different result. Finally, Dr. Gul-latt agreed that patients with ischemic bowel have a low survival rate.
 

 Dr. McHugh also testified on his own behalf. According to Dr. McHugh when he first saw Mr. Keeslar his initial white blood count was within normal ranges. He noted that Dr. Alexander had circled a small, | ^localized area of the stomach where the patient was in pain. Dr. McHugh testified that localized pain would be atypical for generalized ischemic bowel. Dr. McHugh also explained that when he initially saw Mr. Keeslar and reviewed his test results, the radiology report noted a “massive amount of formed stool throughout the colon.” He noted that the radiologist’s use of the word “massive” was unusual. Dr. McHugh reviewed the nurse’s notation that Mr. Keeslar was pain-free at 5:00 p.m. He testified that he first saw Mr. Keeslar between 6:30-7:00 p.m. in the emergency room and, at that time, he physically examined the patient. In reference to that examination, Dr. McHugh described the pain associated with ischemic bowel as typically “the worst pain you can have.... It’s the heart attack of the intestine.” However, Dr. McHugh noted that in this case, when he examined the patient, he did not display any pain (his last pain shot had been approximately five hours earlier). Dr. McHugh explained that Mr. Keeslar was admitted to the hospital at 7:30 p.m., and Dr. McHugh was paged back to the hospital at 9:30. Between that time, no one called him to inform him of any changes in the patient’s condition. In fact, he stated that when he returned his page, the nurse made no mention of increased abdominal pain. At approximately 10:25 p.m. Dr. McHugh was informed that
 
 *940
 
 the patient has developed shortness of breath, and so he consulted Dr. Gullatt for pulmonary assistance. Dr. McHugh returned to the patient around 11:00 p.m., and he made the decision to move Mr. Keeslar to the intensive care unit (“ICU”). Dr. McHugh was present when Dr. Gullatt arrived at 11:25, and he accompanied the patient and Dr. Gullatt to the emergency room where he was to undergo bronchos-copy (intubation). 11sAgain, when Dr. Gul-latt examined the patient, there was no point tenderness in the abdomen — at that time, the patient’s only ailments seemed to be more pulmonary. Considering that and the fact that the patient was in the ICU, which is the domain of the intensivist (i.e., Dr. Gullatt), he was comfortable with Dr. Gullatt taking over Mr. Keeslar’s care; thus, he went home for the evening at around 12:30 a.m. on February 14. When Dr. Gullatt noted a change in Mr. Kees-lar’s condition to warrant a call to the surgeon, Dr. Lolley, Dr. McHugh was never notified. It was not until 8:40 a.m., when Dr. McHugh came back to see the patient, that he suspected ischemic bowel in light of the patient’s overnight deterioration. Dr. McHugh noted several reasons why he did not initially diagnose the patient’s ischemic bowel: a benign physical examination; only moderate pain during his examination of the patient; the “massive” amount of stool in his colon leading to his impression of constipation; a normal white blood count; and, relatively normal temperature.
 

 The defense also called Dr. Claude Minor, a general surgeon, to testify. He was certified as an expert medical doctor, general surgeon, with a specialty in trauma and surgical critical care. Although he had not been a part of the patient’s care, Dr. Minor had been a surgeon at Glen-wood and, thus, was familiar with the standard of care and protocol of that facility. He agreed that for a diagnosis of ischemic bowel, excruciating, writhing pain is experienced by the patient. He related one typical example of a 45-year-old patient with ischemic bowel whose pain had not been relieved with 100 milligrams of Demerol. For comparison in this case, prior to seeing Dr. McHugh, the patient had received 2 milligrams of Dilaudid, which Dr. | uMinor said was equivalent to 20-30 milligrams of Demerol. Dr. Minor opined that small amount of painkiller would not typically affect the pain associated with is-chemic bowel. Additionally, Dr. Minor agreed that the admitting notes of Dr. Alexander indicated pain in an area of the abdomen not typically associated with is-chemic bowel. Dr. Minor testified that the care rendered to Mr. Keeslar was appropriate. Further, he opined that up until Dr. Lolley’s examination of the patient at 2:00 a.m., there had been no evidence of ischemic bowel. He pointed out that even then Dr. Lolley only listed “possible is-chemic bowel” as a third impression, and this after Mr. Keeslar had rapidly deteriorated. Dr. Minor opined that Mr. Kees-lar’s survival prospect was low, especially considering that his disease progressed rapidly and he showed no pathognomic signs or symptoms of the illness.
 

 Finally, the defense called its last witness, Dr. David Scott, a gastroenterologist, who was tendered as an expert medical doctor in internal medicine, specifically gastroenterology. Dr. Scott was not involved with Mr. Keeslar’s case personally and only had reviewed the medical records. He testified that in his 17 years of practice, he had seen five or six cases of ischemic bowel, noting that they are all complicated cases. By looking at the patient’s medical record from Glenwood, Dr. Scott noted that he appeared to be stable when he left the ER and was admitted to the hospital at approximately 7:30 p.m. Dr. Scott stated that according to the records the patient did not have the type of pain normally seen with ischemic bowel. He
 
 *941
 
 concluded that he did not believe that Dr. McHugh had breached the standard of care in treating Mr. Keeslar.
 

 | ifiHere, the jury was presented with opposing, but permissible, views of the evidence regarding Dr. McHugh’s treatment of Mr. Keeslar. However, although differing in their final opinion regarding a possible breach of the standard of care, certain common impressions by the physicians stand out: ischemic bowel is a complicated diagnosis which is most often fatal and is typified by extreme, nearly untreatable pain. Here, the stand-out fact is that Mr. Keeslar did not appear to be in excruciating pain — the hallmark symptom of is-chemic bowel as described by all the expert witnesses for both sides. It is always tragic when a patient dies, especially when the patient is relatively young and the onset of illness is unexpected and quick. But in this matter, the jury was presented with two permissible views of the evidence regarding whether Dr. McHugh breached the standard of care and caused the death of Dale Keeslar. The jury obviously chose to credit Dr. McHugh and his experts over the others. The objective evidence does not contradict that finding. Accordingly, we cannot find that the jury verdict in favor of Dr. McHugh was manifestly erroneous or clearly wrong.
 

 Conclusion
 

 For the forgoing reasons, we affirm the jury verdict in favor of the defendant, Dr. J.B. “Duke” McHugh, finding that Dr. McHugh did not breach the standard of care applicable to gastroenterologists in this case and dismissing the claims of the plaintiff, Donna Keeslar, individually and on behalf of Myron Keeslar. Costs in this matter are assessed to Donna Keeslar.
 

 AFFIRMED.