CARAWAY, J.
11 This is an appeal of a Monroe City Court judgment awarding plaintiff $27,145.72 in general and special damages against a medical clinic for medical malpractice in connection with treatment of an alleged spider bite. Finding that the plaintiff did not establish the standard of care that was allegedly breached by the clinic, we reverse and vacate the trial court’s judgment.

Facts and Procedural Background

On April 22, 2006, Larry Shell (“Shell”) was operating a lawn mower when he felt something bite him underneath his left arm and on his shoulder. He looked down to find that there was a small spider hanging from a web that was attached to his arm. He was unable to capture the spider. Initially, Shell treated the bite himself by applying rubbing alcohol and Neos-porin.
After two days, the bite had abscessed and Shell was in excruciating pain that prevented him from effectively working at the post office. On April 26, 2006, Shell went to St. Francis Convenience Clinic (the “Clinic”), operated by St. Francis Medical Center, Inc. (“St. Francis”), for medical care for two separate abscesses.[1] The Clinic operates under a collaborative agreement, which allows advanced practice registered nurses (“APRN”)[2] to diagnose and treat patients with physician collaboration. The records of the |2Clinic show that Shell wrote that his reason for seeking treatment was for “bumps.”[3]
Shell was first seen by an unidentified licensed practical nürse (“LPN”) who took Shell’s initial history. Under “Chief Complaint,” the LPN wrote, “Severe pain to [left] axilla 2+ abscess. Also small abscess underneath armpit.” Next, APRN Ellen Murray (“Nurse Murray”) attended Shell and took additional history. Under the LPN’s notation, Nurse Murray wrote, “Present times five days. No Fever. Also complains of brown spots on his back for years.” Shell claims that he told both the *398 LPN and Nurse Murray that he had been bitten by a spider, but the history documented at the time of the visit does not contain that information. Nurse Murray then treated the abscesses by doing an incision and drainage (“I & D”) by lancing them open, squeezing out the pus, disinfecting and packing the abscesses, and instructing Shell to return for followup treatment the following day.
On April 27, 2006, Shell returned to the Clinic. On this visit, Dr. Nahid Islam treated Shell.[4] She noted on his charts that Shell was doing well and denying significant pain, which she testified meant the treatment from the previous day was effective. Dr. Islam repacked the large abscess and cleaned the other. Dr. Islam advised Shell to use warm compresses because that is typically done after an I & D to increase the blood flow to the | ¡¡area. She also instructed Shell to return the next day. Shell testified that he told Dr. Islam of the spider bite, but it is not reflected in the history from his visit with Dr. Islam.
Shell returned to the Clinic on April 28 and 30. He was attended by an APRN who redressed and repacked the abscess.
On May 2, 2006, Shell returned to the Clinic where he was again treated by Dr. Islam. On this visit, Dr. Islam did not repack the abscess because it had pink granulation tissue, which she testified meant that the abscess was being replaced by healthy tissue. She cleaned the abscesses and released Shell. Shell again states that he told the Clinic of the spider bite, but yet again, this information was not documented.
Following this course of treatment, the abscesses appeared to be healed. Shell testified that the abscesses healed after a couple of days from the May 2, 2006 visit. However, around two weeks later, Shell noticed some red dots forming under his armpit. The red dots progressed quickly into multiple lumps under his arm taking up a large area around the beginning of June 2006. He was in great pain at the time and was unable to effectively work.
Shell returned to the Clinic on June 5, 2006. He was treated by APRN Dorothy Minor (“Nurse Minor”) who recommended surgical intervention. Nurse Minor wrote the following under “Chief Complaint” on Shell’s chart: “Swollen [left] armpit. [Times] 1 % weeks. It’s getting bigger. Some pain. [Zero] fever.” The following day, Shell visited with his family physician, Dr. Narendra Kutnikar. For the first time, Shell’s chief complaint |4was documented as a spider bite on June 6, 2006. Dr. Kutnikar testified he saw a large abscess and a healed spider bite, and he admitted Shell for surgery at Monroe Surgical. Thereafter, Shell missed a total of seven days of work due to the surgery and was released to return to work on June 20, 2006.
Shell filed this claim against St. Francis for medical malpractice, which was initially reviewed by a medical review panel. He claimed that St. Francis did not properly treat him under the appropriate standard of care for spider bites. The medical review panel unanimously ruled in favor of St. Francis on July 15, 2009. In its written opinion, the medical review panel noted the factual dispute over whether Shell ever told anyone at the Clinic that he was bitten by a spider. The medical review panel did not make any factual determination regarding whether Shell reported the spider bite. Nevertheless, the panel found *399 that based on Shell’s condition when he presented to the Clinic, St. Francis met the standard of care by its actions. Those actions included (1) recordation of Shell’s history and physical, (2) examination of lesions, (3) cleansing and debridement and/or packing as needed, (4) treatment with topical antibiotics and/or systemic antibiotics, and (5) followup treatment.
Following the medical review panel opinion, Shell filed suit in Monroe City Court against St. Francis for medical malpractice. He claims that St. Francis failed to meet the appropriate standard of care because (1) no one at the Clinic recorded his history or considered the significance of the spider bite because the treatment of the abscess depends on the cause of 1¡¡the abscess; (2) Shell should not have been treated by Nurse Murray for a spider bite, but instead by a physician and followed closely; (3) Nurse Murray squeezed the abscess after lancing it open, causing the spider bite toxins to seep deeper into the body; (4) Dr. Islam applied heat to the abscess, also causing the toxin to move deeper into the body; and (5) Dr. Islam prematurely released Shell who due to the unpredictable course of spider bites should be closely monitored. Furthermore, Shell claims that APRNs are not permitted to treat patients without physician consultation under the APRN collaborative practice legal regime. He claims that because he was treated only by an APRN rather than a physician on the initial visit, St. Francis breached the appropriate standard of care. He claims these breaches in the standard of care led to the need for his eventual surgery and caused him pain and suffering, lost wages, medical expenses, and a tingling sensation or numbness in his left arm that persists to this day.
During trial, Shell testified and also called Nurse Murray as a witness. Dr. Kutnikar’s testimony was introduced by his deposition. Shell also introduced the collaborative practice agreement in force at the Clinic. Finally, without objection, Shell placed into evidence pages from Clinical Guidelines in the Family Practice (“Clinical Guidelines”). This medical book is referenced in the collaborative practice agreement providing medical guidelines and directives for the APRNs at the Clinic.
St. Francis called Nurse Murray and Dr. Islam to testify. Additionally, St. Francis introduced the medical review panel opinion and the deposition of Dr. Paul Watson, who served on the medical review panel.
|fiThe testimony shows that the typical practice at St. Francis is that patients see either an APRN or a physician, depending on whoever is available. Dr. Islam must be present at the clinic at least 20 hours per week and remain available by phone for any questions that may arise concerning a patient’s treatment. Typically, Dr. Islam will see a patient initially treated by an APRN only if the APRN asks for Dr. Islam’s opinion. Nurse Murray never asked for Dr. Islam’s opinion in Shell’s initial treatment.
Additionally, Nurse Murray and Dr. Islam both testified that it is important to take an adequate history of a patient and that if any patient mentions being bitten by a spider, they would always note it in the patient’s history regardless of whether they believed that the patient was actually bitten. They testified that many patients with abscesses come to the Clinic believing they are caused by spider bites. But nonetheless, they stated that whether a spider bit Shell or not, the treatment for the condition of his abscess would have been the same. They stated that an abscess is always treated the same way regardless of the cause, which is typically an I & D and the application of heat. They *400 testified that to treat a spider bite, the patient should present the spider so that any special treatment may be determined.
Dr. Islam also testified concerning the need to perform a culture on the abscess. Dr. Islam was asked at trial by defense counsel whether Nurse Murray should have pérformed a culture to determine the proper medication to provide to Shell. She stated that had she been the first to see Shell, she would have performed such a culture to determine the required antibiotic for the treatment of any bacterial infection. However, she stated that by the [ 7time she saw Shell, he had already been provided the antibiotic Bactrim. The antibiotic would have affected the reliability of the results of the culture. She noted that the absence of a culture presented no medical concern because he was healing throughout his visits to the Convenience Clinic. Furthermore, the medical review panel opinion stated that “a culture may have been helpful initially, the culture was not [the] standard of care at [that] time.” Furthermore, when asked about cultures detecting a toxin or poison, Dr. Watson in his deposition testimony stated that “[fit’s very difficult to test for a toxin to start with.”
Dr. Watson also testified that the treatment of ah abscess is to perform an I & D whether or not it is caused by a spider bite. He testified that the effects of a spider bite depend on the type of spider— some cause necrosis of tissue, while others cause neurological or other effects. He testified that by the time Shell presented to the Clinic after four days, the toxin had done whatever it would have done by then. Because it caused an abscess, it should have been treated as an abscess.
Dr. Kutnikar also testified that the treatment Shell received at the Clinic was appropriate. He testified that it was possible that a spider bite caused the abscesses, but that an I & D was appropriate for removing the toxin that might have been present in the skin. Additionally, Dr. Kut-nikar stated that a physician probably did not need to see Shell unless the abscess did not heal after the initial treatment, but Dr. Watson believed that an APRN who has never treated a spider bite should ask for a physician’s 18assistance. Nurse Murray had never treated a spider bite prior to Shell, but she routinely treated abscesses.
The practice guidelines in Clinical Guidelines suggested a different course of treatment. It contains a section labeled “Insect Sting and Brown Recluse Spider Bite.” It states that brown recluse bites may cause tissue necrosis, which is tissue death, as early as four hours after a bite. Regarding treatment for a brown recluse spider bite, the Clinical Guidelines state that application of heat should be avoided. It states that complications of wound healing may occur at any time until resolution and that patients must be instructed in signs and symptoms of wound infection.
Regarding causation, Dr. Islam testified concerning the difference between chronic and recurring abscesses. She stated that a chronic abscess would be a continuation of the same abscess, while recurring abscesses would be separate abscesses unrelated to the first. She stated that when Shell returned to the Clinic on June 5, 2006, he had recurring rather than chronic abscesses. Dr. Islam stated that abscesses in the axilla are very common and recurring abscesses there indicate abscesses caused by bacteria. Such a recurrence of bacteria is the condition hidradenitis, which was a possible cause of his multiple abscesses. Because the abscesses were recurring, there was nothing that St. Francis could have done to prevent the second set of abscesses from developing. Dr. Watson, in his deposition testimony, *401 stated that if a spider had bitten Shell, it would have only caused one abscess, so the second development very likely had nothing to do with the first. Additionally, he stated even if the toxin was not appropriately | ^removed during the first visit, it would have been gone by June 5, 2006, because the protein of the toxin would have broken down by then.
Dr. Kutnikar agreed that the proper treatment was given to Shell by performing an I & D, but the lesion got worse. When asked why it might have gotten worse, Dr. Kutnikar stated it was probably because Shell did not follow up properly. Dr. Kutnikar also stated that it was unclear whether an insect bite had caused the abscesses or precipitated a preexisting condition. When asked whether the cause of the surgery was toxin left in the body, Dr. Kutnikar answered yes,- but equivocated by stating, “Well, I cannot tell you whether it is a spider bite toxin or the abscess that developed as it — or even the spider bite just got worse.” Dr. Kutnikar also testified that one spider bite would not lead to multiple red dots on the arm, but only one abscess at the spot of the bite instead.
Finally, regarding Shell’s complaint of numbness and tingling in his left arm, Shell was never diagnosed with any neurological condition and never saw a doctor for this complaint. Dr. Kutnikar’s examination in June 2006 specifically found no neurological deficits. When asked whether a spider bite could lead to nerve damage, Dr. Kutnikar stated that it “should not affect your nerves or anything in the area.”
Following the trial, the trial court-found that St. Francis had committed medical malpractice. The trial court found that Shell had informed Nurse Murray that' he was bitten by a spider. The trial court also found that the second set of abscesses would not have occurred if the treatment was appropriate for the first abscesses, thus negating the need for 110surgery. The trial court additionally determined that the Clinic did not appropriately follow the law for collaborative practices or have a complete collaborative practice agreement governing the Clinic. The trial court awarded Shell $27,145.72 total with $26,500 in general damages and $645.72 in special damages. St. Francis appeals this judgment.

Applicable Law

A hospital is responsible for the negligence of its employees under the doctrine of respondeat superior. Farmer v. Willis-Knighton Med. Ctr., 47,530 (La. App.2d Cir.11/14/12), 109 So.3d 15; Campbell v. Hosp. Serv. Dist. No. 1 Caldwell Parish, 33,874 (La.App.2d Cir.10/04/00), 768 So.2d 803, citing Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332 (La.App. 2d Cir.1991). Under this theory, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned. Campbell, supra, citing Corley v. State, Dept. of Health & Hospitals, 32,613 (La.App.2d Cir.12/30/99), 749 So.2d 926, 930; McCraw v. Louisiana State Univ. Med. Ctr., 627 So.2d 767 (La.App. 2d Cir.1993), writ denied, 94-OOOL (La.3/11/94), 634 So.2d 399; Bolton v. Louisiana State Univ. Med. Ctr., 601 So.2d 677, 681 (La.App. 2d Cir.1992).
In a medical malpractice action, the plaintiff must meet the burden of proof established by La. R.S. 9:2794. Under La. R.S. 9:2794(A), a plaintiff has the burden of proving the following:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or lo *402 cale and under similar circumstances; and where the defendant practices in a particular specialty and where the ^alleged acts of medical negligence raise issues peculiar to the peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A). Thus, a medical malpractice claimant must establish by a preponderance of the evidence (1) the standard of care applicable to the defendant; (2) that the defendant breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. Marenghi v. Louisiana Med. Mut. Ins., Co., 46,032 (La.App.2d Cir.4/13/11), 62 So.3d 847; Swillie v. St. Francis Med. Ctr., 45,543 (La.App.2d Cir.9/22/10), 48 So.3d 317; Poullard v. Pittman, 44,110 (La.App.2d Cir.4/08/09), 6 So.3d 1064; Hubbard v. North Monroe Med. Ctr., 42,744 (La.App.2d Cir.12/12/07), 973 So.2d 847; Orea v. Brannan, 30,628 (La.App.2d Cir.6/24/98), 715 So.2d 108.
Nurses who perform medical services are subject to the same standards of care and liability as are physicians. Farmer, supra. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, along with his best judgment, in the application of his or her skill to the case. Farmer, supra.
| ^Resolution of each of these inquiries is a determination of fact that should not be reversed on appeal absent manifest error. Keeslar v. McHugh, 44,641 (La.App.2d Cir.9/30/09), 24 So.3d 933, citing Martin v. East Jefferson Gen. Hasp., 582 So.2d 1272 (La.1991); Cox v. Willis-Knighton Med. Ctr., 28,632 (La.App.2d Cir.9/25/96), 680 So.2d 1309. In order to reverse a factfin-der’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding; and, (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Bailey v. Donley, 44,919 (La.App.2d Cir.12/09/09), 26 So.3d 987, citing Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.04/03/02), 816 So.2d 270.
Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Bailey, supra, citing Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). But where such factors are not present, and a fact finder’s finding is based on its decision to credit *403 the testimony of one of two or more | ^witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Bailey, supra, citing Salvant v. State, 05-2126 (La.07/06/06), 935 So.2d 646.
The Louisiana Supreme Court has found that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Schultz v. Guoth, 10-0343 (La.01/19/11), 57 So.3d 1002; Swillie, supra, citing Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94), 643 So.2d 1228; Poullard, supra; Jeffery v. Bickham, 34,946 (La.App.2d Cir.08/22/01), 795 So.2d 443. In most cases, however, because of the complex medical and factual issues involved, a plaintiff who does not present medical expert testimony will likely fail to sustain his burden of proving his claim under the requirements of La. R.S. 9:2794. Schultz, supra; Swillie, supra; Poullard, supra; Jeffery, supra. Nevertheless, expert testimony is not required where the physician does an obviously careless act from which a lay person can infer negligence, such as fracturing a leg during an examination, amputating the wrong arm, dropping a knife or scalpel on a patient, or leaving a sponge in a patient’s body. Schultz, supra; Swillie, supra; Poullard, supra; Jeffery, supra. As a general rule, a plaintiff can prevail under such circumstances when a defendanVphysician or a defense expert testifies regarding the standard of care, and the objective evidence at trial is such that a lay factfinder can infer negligence from the facts. Pfiffner, supra. However, a plaintiff must also establish with adequate evidence a causal connection between a defendant’s negligence and the plaintiffs injuries. Pfiffner, supra.
|14Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. La. R.S. 40:1299.47(H).

Discussion

St. Francis appeals the judgment of the trial court arguing that Shell failed to meet his burden of proof. Specifically, St. Francis argues that Shell did not produce an expert to establish the standard of care and to explain how a breach of that standard caused Shell’s medical complications leading to his surgery. St. Francis contends that the medical review panel’s opinion clearly established the standard of care and found no breach of that standard by the Clinic’s treatment of Shell’s abscess. Shell asserted at trial and argues on appeal that the standard of care was established primarily by the Clinical Guidelines and by the law of collaborative practices. Additionally, he cites testimony of defense witnesses and deposition testimony of Drs. Kutnikar and Watson for establishing the appropriate standard of care.
Four facts from Shell’s testimony which have significance for this malpractice claim are the following:
(1) Shell identified April 22 (a Saturday) as the date of the spider bite, which was four days before he went to the Clinic;
(2) Shell could not identify the type of spider that bit him;
(3) Shell advised the Clinic personnel on his initial visit on April 26, and thereafter, that he was bitten by a spider; and
11fi(4) Shell experienced a time period of apparent recovery from his initial abscessed wound following his last *404 visit to the Clinic on May 2 and before the return of symptoms later in the month.
From our review of the record, the actual treatment which was rendered to Shell on his multiple visits to the Clinic in late April and early May involved the following:
(1) On April 26, Nurse Murray slit the abscess with a surgical knife then expressed pus from the wound by squeezing (an I & D). She cleansed the wound with dermal wound cleanser, Betadine, alcohol, and one percent Lidocaine. She probed the wound with a peroxide Q-tip with no “tunneling.” She packed the wound with iodoform gauze. She told Shell to keep the area dry and return the next day for packing change.
(2) On April 27, Dr. Islam repacked and cleaned the wound the next day. In the process, Dr. Islam applied warm compresses to the wound. She instructed Shell to continue antibiotics as prescribed and to keep the area dry.
(3) On April 28 and 30, Nurse Morris cleaned and repacked the wound in essentially the same manner.
(4) On May 2, Dr. Islam noted healthy tissue was growing and cleaned the wound with antibacterial ointment and soap.
Significantly, the parties’ primary dispute over this course of treatment concerned two different views. The defense, as reflected in the opinion of the medical review panel, viewed this as the correct course of treatment for a patient presenting with a 3.5cm axillary lesion or abscess. Shell’s view is that a different treatment for a spider bite was called for and the Clinic personnel, who were informed of Shell’s spider bite, failed to treat his abscess accordingly.
Nevertheless, from the testimony of the three doctors in the record and the collective written opinion of the medical review panel, no doctor singled out any aspect of this treatment rendered between April 26 and May | lfi2 as being improper and falling below the standard of care. Those opinions rested upon the proper treatment generally for an abscess. Of the doctors who were specifically questioned about spider bites and the possibility that Shell’s abscess resulted from one, no doctor identified any aspect of the above treatment as improper treatment for spider bites or explained how any deficient treatment caused Shell’s later complications in June. While Dr. Watson did state that he “personally” would not have squeezed a lanced abscess if caused by a spider bite, he did not relate how such squeezing, which occurred in this case, could cause Shell’s later complications.
Solely from the medical testimony of the doctors, and accepting as true Shell’s reporting of the spider bite to the Clinic personnel, we agree with St. Francis that the standard of medical care, its breach, and the causation for Shell’s complications requiring surgery are not proven. Shell’s foundational premise for malpractice, however, rests on the section of the Clinical Guidelines entitled “Insect Sting and Brown Recluse Spider Bite.” The doctors were questioned regarding the Clinical Guidelines or the treatment of spider bites generally. No doctor reflected that his or her opinion rested on the Clinical Guidelines as a medical authority demonstrating that medical malpractice occurred. In fact, even under questioning concerning the possibility of a spider bite and the treatment of such bites, none of the doctors expressed an opinion that the Clinic’s treatment of Shell amounted to medical malpractice.
*405 The Clinical Guidelines distinguish between (1) stinging insects, such as bees and wasps, (2) “the 50 or so species known to bite humans,” and (3) |17the “brown recluse spider.” The separate sections concerning “pathogenesis,” “clinical presentation,” “diagnosis/evaluation,” and “plan/treatment” are lengthy. Significantly, from our reading, the overall context of these guidelines for the various stinging or biting insects and spiders appears to address patients reporting with symptoms within a short time period after a bite or sting. The removal of an insect’s stinger is discussed and attention is given to ana-phylactic reactions. Within this broad context, the specific symptoms and treatment for the brown recluse spider bite are listed as follows:
Clinical Presentation
^ í{: H5 ❖
2. Bite may feel sharp, or, more often, remains unnoticed; within a few hours minor swelling and erythema with a surrounding pale halo from vasospasm at the site often occurs
3. Severity of local reaction appears to depend on site of bite with fatty areas of body developing more severe reactions
4. Tissue necrosis in bite area may develop as early as four hours after bite
5. Cutaneous changes at the site include a blue-gray, macular halo around puncture site; emergence of pustule or vesiele/bulia at site; widening of macule and sinking of center of lesions producing a “sinking infarct”; sloughing of tissue leaves a deep ulcer which takes weeks or months to heal
6. In rare eases, within 12 hours after bite, systemic symptoms of fever, chills, nausea, vomiting, and generalized weakness may appear; rarely, severe systemic reactions of generalized hemolysis, disseminated intra-vascular coagulation, and renal failure occur (usually only in children)
Plan/Treatment
******
I. Diagnosis of brown recluse spider bite should be made only after corroborative evidence is sought; other, more likely causes of necrotic wounds should be sought in cases where no spider is recovered and identified by an expert
|1RJ. Treatment of the brown recluse bite is controversial; there are no accepted, conclusively established guidelines
1. All experts recommend the following conservative treatment
a. Gently cleanse with soap and water
b. Apply ice and elevate
c. Avoid strenuous exercise
d. AVOID APPLICATION OF HEAT
e. Monitor the patient closely for the first 72 hours
f. Give tetanus toxoid if indicated
2. Controversy surrounds which drugs, if any, are indicated
a. No drug treatments are indicated, according to most experts (excellent outcomes usually occur without any pharmacologic interventions)
b. If systemic signs and symptoms are present, refer patient to an expert for management
These provisions of the Clinical Guidelines are likewise insufficient to establish a standard of care and explain how the negligence of St. Francis medical personnel caused injury to Shell. Most importantly, *406 Shell could not prove that a brown recluse spider bit him. Shell’s presentation at the Clinic four days after the spider bite calls into question whether these guidelines for treatment remained applicable in all respects. The guidelines do not address the treatment for a 4-day-old abscess. Also, there was medical testimony concerning the breakdown of toxins, and an explanation of the spread of remaining toxin after four days is needed to remove considerable doubt regarding causation. Finally, the Clinical Guidelines do not address causation, giving needed explanation which might link the medical treatment actions of the Clinic in early May to the reappearance of abscess symptoms by early June.
The burden of proof requirements of La. R.S. 9:2794 require medical expertise to explain the alleged deficient treatment in this case and to establish causation for Shell’s injuries. There are too many medical 119questions about which a lay fact finder and this court should not speculate. Our review of the record shows that this is not a case where medical expert testimony was not needed. The complexity of the evident medical questions surrounding Shell’s treatment required additional proof for his recovery. Accordingly, we find the trial court’s ruling determining medical malpractice clearly wrong.
Finally, for the same reasons, we reject Shell’s argument that the treatment he initially received by the LPN and APRN Murray violated the parameters of a proper collaborative practice for advanced practice nursing. Shell asserts that the nursing actions without supervision of a physician on that date were contrary to Louisiana’s definition of collaborative practice arrangements. See La. R.S. 37:913(7)-(9). Since all of the expert testimony established that the appropriate standard of care was to perform an I & D for Shell’s initial presentation with the abscess, the failure of Dr. Islam to attend to Shell on his first visit to the Clinic resulted in no consequences causing Shell damage. He was attended throughout his subsequent visits by Dr. Islam, who released Shell on May 2 with the apparent healing of the abscess.

Conclusion

For the foregoing reasons, the trial court’s judgment is reversed. Costs of these proceedings are assessed to appellee.
REVERSED.
DREW, J., concurs.

. The abscess of specific concern regarding the disputed treatment in this case was a 3.5cm axillary lesion.

. APRNs are registered nurses with two years advanced training; in this case, all APRNs are Nurse Practitioners, which are a subcategory of APRN.

.The original handwritten copies of the admission forms of patients are not maintained by the Clinic. The record as it exists is from the electronic record of information provided on the handwritten forms. The actual handwritten charts of the nurses containing his history were admitted into evidence.

. Dr. Islam has her own practice but is also the medical director of the Clinic, and she is employed for that purpose by Dr. Louie Crook who owns a company with an independent contract to run the collaborative practice at the Clinic.